[Cite as *Bryant v. Gen. Motors Corp.*, 2015-Ohio-4911.]

**IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
DEFIANCE COUNTY**

LORETTA S. BRYANT, SURVIVING
SPOUSE OF IVAN BRYANT, DECEASED,

    PLAINTIFF-APPELLEE,           CASE NO.  4-15-03

    v.

GENERAL MOTORS CORP.,

    DEFENDANT-APPELLANT,
    -and-

MARSHA P. RYAN, ADMR.,           O P I N I O N
OHIO BUREAU OF WORKERS
COMP, ET AL.

    DEFENDANTS-APPELLEES.

**Appeal from Defiance County Common Pleas Court
Trial Court No. 09-CV-40370**

**Judgment Affirmed**

**Date of Decision:   November 30, 2015**

**APPEARANCES:**

    *Marc S. Barnes* **for Appellant**

    *Shawn M. Acton* **for Appellee, Loretta S. Bryant**

Case No. 4-15-03

**SHAW, J.**

{¶1} Defendant-appellant, Powertrain Division, General Motors Corporation ("GM"), appeals a jury verdict finding that plaintiff-appellee, Loretta Bryant ("Loretta"), is entitled to participate in the Ohio Workers' Compensation Fund as a result of the occupational exposure to asbestos sustained by her deceased husband, Ivan Bryant ("Ivan"), which contributed to his death from lung cancer.

### *Procedural History and Facts*

{¶2} Loretta commenced the underlying case as an appeal, pursuant to R.C. 4123.512, after the Ohio Bureau of Workers' Compensation denied her request for widow's benefits of her late husband, Ivan. Loretta alleged that Ivan sustained an injurious exposure to asbestos as a result of his job duties at GM and that his asbestos-related lung cancer was the direct and proximate cause of his death. The complaint claimed that Ivan's employment with GM created a risk of contracting asbestos-related diseases and conditions in a greater degree and in a different manner than the public generally. GM denied that Ivan's lung cancer was asbestos-related and denied that he contracted his lung cancer as a result of his employment at GM's Defiance facility. Further, GM contended that Ivan's long-time habit of smoking one to two packs of cigarettes a day was the sole cause of his lung cancer.

-2-

{¶3} The case proceeded to a jury trial. Loretta presented Robert Bell, a former GM employee, who testified to the existence several products containing asbestos at GM and common practices at the plant relating to the use of those products. Bell also relayed his interactions with Ivan at GM and his recollection of their occupational exposure to airborne asbestos. In addition, Loretta presented the expert testimony of Dr. L.C. Rao who reviewed several medical records belonging to Ivan and gave his expert medical opinion establishing a causal link between Ivan's asbestos exposure at GM, the development of his lung cancer and his death. Loretta also took the stand and recalled her experience with Ivan's employment at GM and his subsequent illness and death.

{¶4} In addition to this testimony, Loretta also submitted Plaintiff's Exhibits 5 and 6. These exhibits were documents produced by GM during discovery which summarized the removal of asbestos from the Defiance facility between 1981 and 2011 and detailed GM's 2006 policy regarding the prevention of airborne asbestos exposure at the Defiance facility.

{¶5} GM presented two medical experts in its defense: Dr. David Rosenberg and Dr. John Lockey. Both experts reviewed pertinent portions of Ivan's medical records and disputed Loretta's claims that there was any medical evidence establishing Ivan had suffered an injurious exposure to asbestos.

Accordingly, the defense experts opined that the lone cause of Ivan's lung cancer was his long history of smoking cigarettes for over forty years.

**{¶6}** GM orally moved for a directed verdict at the end of Loretta's case-in-chief. The trial court denied the motion for directed verdict. After the testimony of their two medical experts, GM renewed its motion. The trial court again overruled the motion for directed verdict.

**{¶7}** After the close of all the evidence, the jury entered its verdict in favor of Loretta's claim. In specific interrogatories, the jury found that: (1) Ivan was exposed to airborne asbestos fibers during the course of his employment at GM; (2) the conditions of Ivan's employment at GM resulted in a hazard of exposure to airborne fibers, which distinguished his employment in character from employment generally; (3) Ivan's employment at GM created a risk of contracting lung cancer in a greater degree and in a different manner than the public generally; and (4) Ivan's exposure to airborne asbestos fibers was a proximate cause of his lung cancer. The jury further found that Loretta is entitled to participate in the Workers' Compensation Fund.

**{¶8}** GM filed this appeal, asserting three assignments of error.

## ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ERRED BY DENYING GENERAL MOTORS' MOTION FOR DIRECTED VERDICT, WHERE THERE WAS NO EVIDENCE DECEDENT WAS**

**INJURIOUSLY EXPOSED TO AIRBORNE ASBESTOS AT GENERAL MOTORS.**

**ASSIGNMENT OF ERROR NO. II**

**THE TRIAL COURT ERRED BY ADMITTING GENERAL MOTORS' DOCUMENTS OVER GENERAL MOTORS' OBJECTIONS.**

**ASSIGNMENT OF ERROR NO. III**

**THE TRIAL COURT ERRED BY ADMITTING THE EXPERT OPINION OF DR. L.C. RAO, WHERE THE OPINION WAS BASED ON FACTS, WHICH WERE NOT ADMITTED INTO EVIDENCE.**

*First Assignment of Error*

{¶9} In its first assignment of error, GM argues that the trial court erred in denying its motion for directed verdict. "A motion for directed verdict tests whether the evidence is sufficient to warrant a jury's consideration, so in deciding whether to grant a directed verdict, a trial court considers neither the weight of the evidence nor the credibility of the witnesses." *Ahmed v. Wise, M.D.*, 10th Dist. No. 12AP-613, 2013-Ohio-2211, ¶ 9. Civil Rule 50(A) sets forth the standard of granting a motion for directed verdict:

> **When a motion for directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.**

**{¶10}** "In deciding a motion for a directed verdict, the trial court must assume that the evidence presented by the nonmovant is true, must give the nonmovant the benefit of all reasonable inferences to be drawn from that evidence, and ascertain whether any substantial probative evidence supports the nonmovant's claim." *Snyder v. Manuel*, 3d Dist. Hancock No. 5-11-39; 2012-Ohio-5951, ¶ 16, citing *Ruta v. Breckenridge–Remy Co.*, 69 Ohio St.2d 66, 68 (1982). We employ a *de novo* standard of review in evaluating the grant or denial of a motion for a directed verdict. *Grau v. Kleinschmidt*, 31 Ohio St.3d 84, 90 (1987).

### Establishing a Right to Participate in the Ohio Workers' Compensation System—Elements of Plaintiff's Claim

**{¶11}** Under R.C. 4123.68, Loretta is entitled to widow's benefits if she can demonstrate that Ivan's death was caused by an occupational disease. Lung cancer is not a specified occupational disease included under the statute. Loretta therefore bears the burden of demonstrating that Ivan's lung cancer meets the criteria for an occupational disease.

R.C. 4123.01(F) defines an "occupational disease" as

> **a disease contracted in the course of employment, which by its causes and the characteristics of its manifestation or the condition of the employment results in a hazard which distinguishes the employment in character from employment generally, and the employment creates a risk of contracting the disease in greater degree and in a different manner from the public in general.**

**{¶12}** In this case, Loretta had to prove that her husband contracted and died from an occupational disease as a result of an injurious exposure to asbestos in the course of and arising out of his employment. *See Snyder v. Ford Motor Co.*, 3d Dist. No. 1-05-41, 2005-Ohio-6415. This includes establishing a direct and proximate causal relationship between the employment and the condition alleged. *See Fox v. Indus. Comm. of Ohio, et al.*, 162 Ohio St. 569 (1955), syllabus.

**{¶13}** Loretta's burden of proof is a preponderance of the evidence, which is defined as "the greater weight of the evidence, that is, evidence that you believe because it outweighs or overbalances in your mind the evidence opposed to it. A preponderance means evidence that is more probable, more persuasive, or of greater probative value. It is the quality of the evidence that must be weighed." *Cawrse v. Allstate Ins. Co.*, 5th Dist. No. 09COA002, 2009-Ohio-2843.

**{¶14}** With these foregoing principles in mind, we turn to discuss whether the trial court erred in denying GM's motion for directed verdict which requires us to examine the evidence presented to support the elements of Loretta's claim.

### *Evidence Relating to Asbestos Exposure at GM*

**{¶15}** Ivan's career with GM spanned nearly thirty years. He began working for GM in 1973 at its Defiance facility and continued working there until he retired in 2001. Ivan died of lung cancer on February 28, 2007. Robert Bell, a former co-worker of Ivan's who also worked at the Defiance facility for nearly

thirty years, testified that he first met Ivan in the mid-1970's in Plant 1 at GM's facility. He recalled they worked together in the "core room" on line 3 for a "few weeks." (Doc. No. 117 at 50-51). After that, Bell remembered Ivan working "up front" and in the foundry, where he observed Ivan performing "clean-up" and other jobs. (Id. at 51). Throughout the proceeding years, Bell also passed through Ivan's area "to get to the locker room, to the break room, to wherever [he] went." (Id. at 77). Bell described the GM facility where he and Ivan worked as one large open space. He recalled that when he first began working there in the early seventies "you couldn't see fifty-six—sixty foot down the plant" because of "the dust and dirt in the air." (Doc. No. 117 at 44).

{¶16} Bell testified that he was not initially aware of the dangers of asbestos when he first began his employment at GM, but later learned about asbestos from safety meetings conducted at the plant. Bell recalled that these safety meetings occurred monthly and sometimes weekly. During these safety meetings the plant foreman warned the employees about asbestos products in the plant. According to Bell, both he and Ivan were exposed to harmful asbestos at GM. He testified to working with several products containing asbestos during his tenure at GM.

### 1. "Asbestos Cloth"

{¶17} One such product was referred to by Bell as "asbestos cloth," which was material used as heat shields throughout the plant. Bell described the product as a white cloth fabric that came in ten-foot rolls. Bell testified that the "[a]sbestos cloth was hung all over. Any place where there was heat they used it as shields." (Doc. No. 117 at 37). Specifically, Bell recalled that the heat shields were "placed [] in areas where the hot irons would be splashed and the cloth would protect people from getting splash [sic] by that iron." (Id.). Bell further described the method customarily used to clean the heat shields. "When those build up so thick with iron, the heat shields, you take an iron bar and you beat the iron off of these. And then when you're beating on them that white powder just flies." (Id. at 71). He explained that when the condition of heat shields "did get bad burn up, you know, where it's falling apart you would change it." (Id. at 38). Bell stated that changing the cloths entailed cutting a new piece of fabric from the ten-foot roll, which caused dust to emit from the fabric. Bell provided the following testimony relative to Ivan's work experience with the heat shields:

> **Plaintiff's Counsel: Now when the two of you, you and Mr. Bryant, were working in the cores—**
>
> **Bell: Um-hm. Yes.**
>
> **Plaintiff's Counsel:—now where [sic] you subjected to any asbestos, airborne asbestos at that time?**

**Defense Counsel: Objection. Relevancy.**

**Bell: Yes.**

**Trial Court: Overruled.**

**Plaintiff's Counsel: And how so?**

**Bell: The cloth was hanging right next to me.**

**Plaintiff's Counsel: And during that time, did you see Mr. Bryant being exposed to any airborne asbestos?**

**Bell: Yes.**

**Plaintiff's Counsel: How so?**

**Bell: He was standing right beside me.**

**Plaintiff's Counsel: Right next to the cloths?**

**Bell: Yes.**

(Doc. No. 117 at 52-53). Bell recalled that the management later eliminated the use of the heat shields in the late 1970s.

### 2. *Pipe Insulation*

{¶18} Bell also testified that the pipes located above the employees' heads were wrapped in asbestos and were in poor condition. Bell described the condition of the pipes:

**Bell: Well, a lot of time in material, like on your steams [sic] pipes are falling off, breaking, you know, and their water pipes are constantly leaking.**

**Plaintiff's Counsel: Okay. Would you see the insulation from these pipes on the ground anytime?**

**Bell: Oh, yes you would. Yeah.**

**Plaintiff's Counsel: Would that create any dust?**

**Bell: Yes, it would.**

(Doc. No. 117 at 42).

### 3. *Furnaces*

{¶19} Bell also observed Ivan performing a specific "clean-up job" sometime in the 1970's "[w]hen he worked up front in the core room they tore out what they called vertical furnaces and he was the one that cleaned them out, and those was wrapped with asbestos." (Doc. No. 117 at 53). Bell's testimony continued:

**Plaintiff's Counsel: You saw him cleaning these vertical—**

**Bell: I saw him cleaning it up.**

**Plaintiff's Counsel: Okay. And there was asbestos?**

**Bell: Yes.**

**Plaintiff's Counsel: Did you see dust?**

**Bell: Yes.**

**Plaintiff's Counsel: Did you ever see Mr. Bryant wear anything—anything, any type of mask when he was working.**

**Bell: I can't say so.**

(Id. at 53-54). Regarding the asbestos wrapped ovens, Bell explained that "[o]ver a period of years they did away with them. Over probably, all the way up until the '90's * * * they tore them out." (Id. at 78).

### 4. "Firebricks"

{¶20} In addition, Bell described "firebricks" made with asbestos that lined the furnaces. (Doc. No. 117 at 39). He explained that employees replaced the "firebricks" when needed and described the method customarily used by the employees to replace the "firebricks," which created a "dusty situation." (Id. at 40). "Well I tore 'em out when they got burned up. When a furnace gets so warm, burn out, you go inside of it and you tear 'em out. That's done with a jack hammer. You know, and then after you get all the fire brick tore out then you have to replace it with all new—you know, we handled it the whole time." (Id.). Bell testified that eventually the employees were told by plant foremen to wear protective masks because the firebricks contained asbestos. (Id. at 74). Bell recalled that the employees "were still passing fire bricks in the '80s." (Id. at 73).

### 5. Ladles

{¶21} Bell also described the process for making ladles which required the mixing of water and a powdery material into a mold.

> **Bell: They bring them in and—the material's brought in, in bags and it's set upon the deck and you bust the bags open, put in the—it's more like a big concrete mixer.**

**Plaintiff's Counsel: okay**

**Bell: You add water and the materials to it.**

**Plaintiff's Counsel: And what are that—what are [sic] the contents of that bag look like?**

**Bell: It's a greyish white material.**

**Plaintiff's Counsel: Okay. Was there a label on that bag?**

**Bell: Yes there is.**

**Plaintiff's Counsel: What was it labeled?**

**Bell: Label, uh—**

**Plaintiff's Counsel: What did it say on the bag?**

**Bell: It's says asbesto [sic]—.**

**Plaintiff's Counsel: Okay.**

**Bell: —on the bags.**

**Plaintiff's Counsel: Now would you be pouring that in and mixing it together yourself?**

**Bell: Yes.**

**Plaintiff's Counsel: Again would dust—**

**Bell: Oh yes.**

**Plaintiff's Counsel:—emanate?**

**Bell: Oh yes.**

(Doc. No. 117 at 40-41).

**{¶22}** Bell testified that he was responsible for cleaning up the dust and described the practice of using air hoses to clear the settled dust off surfaces and materials. He was also involved in the removal of the "asbestos cloth" from the facility. He recalled the removal being "kind of like an OSHA thing, we had to get rid of it all. So what we did just cut it down put it in tubs and haul it out back." (Id. at 43). Bell further stated that to the best of his knowledge there were still asbestos products in the plant at the time he retired from GM in 2000. (Id. at 55). He explained that he personally removed asbestos products and placed them in back rooms. (Id.).

**{¶23}** Loretta also provided testimony at trial. She and Ivan married in 1956 and she recalled when he began his employment at GM. She remembered Ivan working many overtime hours at GM and often working seven days a week. She described Ivan's routine of using the downstairs shower in their home after coming home from GM. She recalled that Ivan typically looked like a "coal miner" and that he was "[v]ery dirty. Dusty. His face would be so dirty that when he take his glasses off you could see where his glasses were." (Doc. No. 117 at 100, 104). Loretta stated that Ivan was a long-time smoker of approximately forty years. She recalled his diagnosis of lung cancer in April of 2005 and his death in February of 2007.

*Discussion*

**{¶24}** On appeal, GM claims that Loretta failed to establish Ivan suffered an injurious exposure to asbestos while employed at GM. Specifically, GM argues that the testimony of Robert Bell was insufficient to establish Ivan's asbestos exposure at the Defiance facility. GM takes issue with the fact that Bell testified he only worked with Ivan for a "few weeks" in the mid-1970's and could not recall whether Ivan was present during the time when the heat shields made from "asbestos cloth" were struck with iron bars and produced dust. GM further contends that Bell's limited knowledge regarding which asbestos products Ivan was exposed to and the fact that Bell admitted to never testing or knowing of any tests performed on the dust to confirm whether it contained asbestos fibers rendered his testimony deficient to establish that airborne asbestos was even present at the GM facility, let alone that Ivan suffered an injurious exposure.

**{¶25}** With respect to the existence of airborne asbestos at GM, Bell identified several products he worked with on a regular basis that contained asbestos. He also testified from first-hand knowledge as to how these products were used which caused a significant amount of dust to emit from the product and become airborne. Notwithstanding the fact that Bell's testimony indicated that some of these products were either labeled with word "asbestos" on the package— i.e., the ladle mix, or were commonly referred to as being made from asbestos—

i.e., the heat shields or "asbestos cloth," Bell also testified to participating in monthly, sometimes weekly, safety meetings where the hazards of asbestos were discussed, and to assisting in the removal of specific asbestos products from GM's facility.

{¶26} Notably, GM failed to present any testimony countering Bell's assertions that these asbestos products were present in the plant and that these products were used in the manner described by Bell. To the contrary, the documents submitted by GM during discovery which were admitted as Plaintiff's Exhibits 5 and 6 (the summary of asbestos removal and asbestos prevention policy) corroborate Bell's testimony to the extent that he discussed the existence and use of several asbestos products throughout the plant.

{¶27} Also, we are not persuaded by GM's argument that Bell's lack of empirical knowledge confirming whether the dust at GM contained friable asbestos fibers somehow rendered his testimony inadequate to establish the presence of airborne asbestos at GM's facility. Bell was qualified to provide testimony from his first-hand knowledge of the things he had actually perceived as an employee at the plant for nearly thirty years, which included his perception as to the existence of and his exposure to airborne asbestos. *See* Evid.R. 602; *see also Welsh v. Ford Motor Co.*, 8th Dist. No. 94068, 2011-Ohio-448, ¶ 28 (finding

the decedent's co-worker qualified to testify to the existence of asbestos in the facility as well as to the decedent's specific asbestos exposure).

{¶28} Turning to Bell's testimony regarding Ivan's injurious exposure to asbestos, Bell recalled that he and Ivan worked in close proximity to the "asbestos cloth" heat shields that were hung throughout the facility and that were periodically beaten to remove excess build-up, which according to Bell generated a considerable amount of dust. Bell also witnessed Ivan performing a "clean-up" job of a vertical furnace which was known by Bell to be wrapped in an asbestos product. Bell noted that this particular "clean-up" job involved the disturbance of a significant amount of dust and debris.

{¶29} Moreover, Bell described the GM facility where he and Ivan worked as a large open-air building that was filled with so much airborne dust and debris that it limited visibly across the plant. Bell further testified to a common practice in the plant of employees using air hoses to clear the dust and debris off surfaces, which in turn redistributed the settled dust back into the air. Loretta also provided testimony that Ivan typically came home from his shifts at GM covered in dust and debris. Notably, there was also testimony from the medical experts on both sides indicating that the visible dust emitting from an asbestos product contains millions of friable asbestos fibers, which is a greater amount of asbestos fiber than that generally found in the ambient air. (Doc. No. 79 at 21; Doc. No. 76 at 53.)

Loretta's expert, Dr. Rao, further testified that there is no safe level of exposure to airborne asbestos.

{¶30} We also find it noteworthy, that several documents contained in Ivan's medical records submitted at trial demonstrate that Ivan's treating physicians listed "asbestosis" either as a secondary diagnosis or as part of his past medical history.  Some of these pages even notate that Ivan had been "compensated for asbestosis" in the past or "had a disability for environmental lung disease."  (*see, e.g*, Plaintiff's Ex. 3, page 69 "History & Physical" Apr. 23, 2005; Plaintiff's Ex. 3, page 85 "Consolation Report" Apr. 23, 2005).  Also of note, is an "Information Sheet" from the Northwest Oncology Center completed and signed by Ivan on May 4, 2005.  In this document, Ivan specifically indicated that he had been exposed to asbestos during his work experience.  (Plaintiff's Ex. 3).

{¶31} In sum, as it pertains to establishing Ivan's injurious exposure to asbestos at GM, we find that there are numerous factors supporting the trial court's decision to overrule GM's motion for directed verdict.  For example: (1) Ivan's co-worker, Robert Bell, identified several asbestos products used at the GM facility during the time of Ivan's employment; (2) Documents produced by GM corroborated Bell's testimony that asbestos products were used at GM during Ivan's employment; (3) According to Bell, these products were inherently dusty

and generated significant amounts of dust during use; (4) After that use, the products deteriorated or were removed in a process that generated substantial amounts of dust and residue; (5) In addition to the use, the cleaning of the products and other surfaces generated additional dust; (6) Expert testimony established that dust seen emanating from asbestos products contains millions of harmful asbestos fibers; (7) Bell witnessed Ivan working in close proximity to some of these asbestos products and engaging in clean-up activities in the locations of asbestos products that generated a significant amount of dust; (8) Loretta stated that Ivan often worked seven days a week during his nearly thirty-year tenure at GM and regularly came home covered in dust and debris; (9) GM's Defiance facility was a large open-air building permitting dust and debris to drift from one department to the next; (10) Bell described the limited visibility in the facility at times due to the amount of floating dust and residue in the air; (11) Several documents in Ivan's medical records referenced conditions associated with a harmful exposure to asbestos; and (12) Expert medical testimony from Loretta's expert indicated that there is no safe level of exposure to airborne asbestos.

{¶32} After construing this evidence most strongly in favor of Loretta, our standard of review requires us to also give her the benefit of all reasonable inferences that may be drawn from the evidence. In applying this standard of review, we find there is sufficient evidence, if believed, relating to the issue of

Ivan's occupational exposure to asbestos at GM to permit reasonable minds to reach different conclusions on this issue. Accordingly, we conclude that the trial court did not err in determining there was sufficient evidence as to this element of Loretta's claim in order for it to be submitted to the jury. *See O'Day v. Webb*, 29 Ohio St. 2d 215, 220 (1972) ("[i]t is uncontestably the duty of a trial court to submit an essential issue to the jury when there is sufficient evidence, if believed, relating to that issue to permit reasonable minds to reach different conclusions on that issue").

### *Medical Evidence Regarding the Causal Relationship*

{¶33} In addition to demonstrating that Ivan sustained an injurious exposure to airborne asbestos while employed at GM, Loretta must also establish a direct and proximate causal relationship between the employment and Ivan's lung cancer. *Cook v. Mayfield*, 45 Ohio St.3d 200, 204 (1989) (A Workers' Compensation claimant seeking the right to participate for an injury arising from an industrial accident must show by a preponderance of the evidence, medical or otherwise, the existence of a direct and proximate causal relationship between the accident and the injury).

{¶34} "Proximate cause" is " 'a happening or event which as a natural and continuous sequence produces an injury without which the result would not have occurred.' " *Williams v. Parker Hannifin Corp.*, 188 Ohio App.3d 715, 2010–

Ohio–1719, ¶ 31 (12th Dist.), quoting *Randall v. Mihm*, 84 Ohio App.3d 402, 406 (2d Dist.1992). An injury may have more than one proximate cause. *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 587 (1991); *McRoberts v. Gen. Elec. Co.*, 12th Dist. Butler No. CA2012-10-216, 2013-Ohio-3083, ¶ 21. "In Ohio, when two factors combine to produce damage or illness, each is a proximate cause." *Norris v. Babcock & Wilcox Co.*, 48 Ohio App.3d 66, 67 (9th Dist.1988). Expert medical testimony is generally necessary to establish both general and specific causation. *Walker v. Ford Motor Co.*, 8th Dist. Cuyahoga No. 100759, 2014-Ohio-4208, ¶ 21.

### 1. Plaintiff's Expert

{¶35} At trial, Loretta presented an expert in support of her claim that Ivan contracted an asbestos-related disease during the course of his employment with GM. Dr. L.C. Rao testified that he is board certified in internal, forensic, and pulmonary medicine, and that he is also a "B-reader," which means that he has specialized training to read chest x-rays for the detection of occupational-related lung disease. He is one of approximately 240 B-readers in the world.[1]

{¶36} Dr. Rao explained that asbestos is fibrous mineral that was extensively used in many industries in the past for its heat resistant properties and that a person can be both directly and indirectly exposed to asbestos. Direct

---

[1] Dr. Rao's testimony was presented to the jury by way of a video-taped deposition taken on September 10, 2014.

exposure consists of handling asbestos fibers—i.e., asbestos bundles of fibers wrapped around pipes or preparing the asbestos cement or asbestos "mud." (Doc. No. 79 at 20). Indirect exposure occurs when the asbestos becomes fragmented, is disseminated into the ambient air, and the asbestos fibers are inhaled into the lungs. He explained that the dust seen coming from an asbestos product contains hundreds and hundreds of millions of microscopic asbestos fibers. (Id. at 21).

{¶37} According to Dr. Rao, there are cancerous and non-cancerous conditions associated with asbestos exposure and inhalation-related lung injury. The two cancerous conditions are (1) lung cancer, due to the fact that asbestos is a well-known carcinogen; and (2) mesothelioma, which is specifically the cancer of the pleura or the membrane covering the lung.

{¶38} The first non-cancerous condition is called asbestosis, which occurs when the asbestos fiber is inhaled and penetrates the lung tissue resulting in irritation and tissue damage. The body reacts by forming a specific pattern of scar tissue called interstitial fibrosis when it heals. Dr. Rao explained that asbestosis typically produces an interstitial thickening in both lung bases and is considered a chronic interstitial lung disease.

{¶39} The second non-cancerous condition is called pleural plaque or diaphragmatic plaque. According to Dr. Rao, this kind of plaque is the scarring of the pleura, which can be damaged by the penetration of asbestos fibers and can

lead to an inflammation called pleurisy. When the pleurisy heals, it causes scarring or pleural fibrosis, and over the years it can become a pleural plaque or a diaphragmatic plaque depending on the location. If the scarring is located around the chest wall, it is pleural plaque. If it is located at the bottom of the lung, it is diaphragmatic plaque.

{¶40} Dr. Rao also discussed a latency period associated with asbestos-related diseases and cancers; specifically, that it may take anywhere from five, ten, fifteen, or twenty plus years from the time of the asbestos exposure to the development of the asbestos-related disease. He further indicated that the presence of asbestosis or diaphragmatic plaque indicates that someone has been exposed to a significant amount of asbestos. However, he also stated that even a minimal exposure in the remote past could later give rise to an asbestos-related disease. Accordingly, he opined that there is no safe level of exposure to airborne asbestos fibers.

{¶41} Dr. Rao reviewed a chest x-ray of Ivan, taken on December 11, 2000, five years before Ivan was diagnosed with lung cancer. Dr. Rao found bilateral interstitial fibrosis in the lower portion of Ivan's lungs, which he indicated is consistent with mild asbestosis. In his report dated April 16, 2006, Dr. Rao concluded "[i]n the presence of a significant occupational exposure history to asbestos dust, and latency period, the radiological findings are consistent with the

diagnosis of bilateral interstitial fibrosis due to asbestosis and asbestos associated diaphragmatic plaque on the left side. In addition, there is evidence of chronic obstructive pulmonary disease." (Doc. No. 79, Ex. 4). At trial, Dr. Rao identified the scarring in Ivan's lungs as being consistent with asbestosis and distinguished it from the kind of scarring related to smoking. (Doc. No. 79 at 37-38). Similarly, Dr. Rao stated that the presence of the diaphragmatic plague is consistent with asbestos-related plural disease and is not caused by smoking. (Id.).

{¶42} Next, Dr. Rao reviewed a chest x-ray of Ivan, taken on October, 3 2005, five months after Ivan was diagnosed with lung cancer. He identified shadowing consistent with bilateral interstitial fibrosis due to asbestos. In addition, Dr. Rao noted evidence showing that the asbestos-related diaphragmatic plaque was now present in both lungs, whereas it was only present on the left side in the 2000 x-ray. He stated that this finding was consistent with the progression of an asbestos-related disease. Dr. Rao also observed evidence of Ivan's lung cancer and the radiation changes from the cancer treatment, which did not appear in the 2000 x-ray. Dr. Rao distinguished the asbestos-related diaphragmatic plaque from the pleural thickening attributable to the cancer and cancer radiation treatment. Specifically, he indicated that the diaphragmatic plaque found on the bottom portion of Ivan's lungs was related to solely to his asbestos exposure and was not caused by smoking or cancer radiation treatment. (Doc. No. 79 at 41-42).

Dr. Rao's conclusions regarding this x-ray were included in a report dated September 6, 2014. (Doc. No. 79, Ex. 5).

{¶43} In addition to the two x-rays, Dr. Rao also reviewed several documents from Ivan's medical records relating to the diagnosis and treatment of his lung cancer. One document was a CT scan report dated January 12, 2007, which was created approximately six weeks prior to Ivan's death. (Doc. No. 79, Ex. 6). Dr. Rao highlighted a specific finding by the reporting physician identifying the presence of "interstitial thickening in both lung bases which may represent chronic interstitial lung disease." (Id.). Dr. Rao testified that this finding is consistent with a diagnosis of asbestosis and that this specific type of scarring is not caused by smoking. (Doc. No. 79 at 51-52). Dr. Rao again noted that the changes related to the progression of the asbestos-related diaphragmatic plaques were located at the bottom of the lungs, whereas the changes related to the lung cancer and the radiation treatment were isolated to the top of the lung. (Id. at 52-53).

{¶44} Dr. Rao reviewed two additional documents, marked Exhibits 7 and 8. Exhibit 7 is a Toledo Hospital "Facesheet" from April 23, 2005 to May 2, 2005, which was compiled during Ivan's hospital visit when he first was diagnosed with lung cancer. Dr. Rao noted in the document that the treating physician listed asbestosis as a "secondary diagnosis" to the primary diagnosis of

lung cancer.  Exhibit 8 is the April 23, 2005 Emergency Room Report from the treating physician at Defiance Regional Hospital where Ivan was first seen prior to being transported to the Toledo Hospital and where Ivan initially received his lung cancer diagnosis.  Dr. Rao noted asbestosis listed by the treating physician in the "past medical history" section of the report.

{¶45} Dr. Rao explained that occupational exposure to asbestos creates an increased risk of developing lung cancer and can cause lung cancer in all areas of the lungs.  He further elucidated that smoking and occupational exposure to asbestos dust multiplies the risk of developing lung cancer:

> **The occupational exposure to asbestos dust, especially in a person who is a smoker, increases the risk of lung cancer synergistically.  In other words, it is not one and one is equal to two.  It's one and one is equal to probably five or ten just to give you an example.  If you're just exposed to asbestos and you are a non-smoker, chances is [sic] 5 in 100 of developing lung cancer. If you are just a smoker but not exposed to asbestos, chances are 10 in 100 of developing lung cancer.  But if you're a smoker at the same time you are exposed to asbestos, chances are 50 in 100. The—it is not a cumulative effect.  It's called as a synergistic effect of the smoking and asbestos giving rise to this exponential increase in the incidence of lung cancer.**

(Doc. No. 79 at 57-58).  Dr. Rao continued to state that asbestosis is not a prerequisite to the development of asbestos-related lung cancer.  Instead, asbestos exposure alone is sufficient to cause lung cancer.  He discussed several peer-reviewed articles supporting this conclusion.

**{¶46}** Relying on the assumption that Ivan was exposed to and breathed in a significant amount of airborne asbestos dust during his long tenure with GM and that Ivan smoked one to two packs of cigarettes a day for 47 years, Dr. Rao opined that the "inhalation of respirable asbestos dust while employed by General Motors" was the cause of Ivan's asbestosis and diaphragmatic plaques. (Doc. No. 79 at 72). Dr. Rao also opined that Ivan was at "an increased risk of development of lung cancer because of his exposure to respirable asbestos dust while working at General Motors." (Doc. No. 79 at 73). Finally, Dr. Rao offered his expert opinion that the "inhalation of respirable asbestos dust in association with the smoking combination caused [Ivan] to develop lung cancer and eventual death." (Id. at 72).

### 2. *Defendant's Experts*

**{¶47}** GM presented two experts in defense of its case: Dr. David Rosenberg and Dr. James Lockey, both board certified pulmonologists, occupational medicine specialists, and "B readers."[2] Both experts agreed that the interaction between smoking and asbestos-related diseases, such as asbestosis and pleural plaques, elevates an individual's risk of developing lung cancer. Dr. Rosenberg characterized the effect of asbestos and smoking overall as "more than additive, less than multiplicative." (Doc. No. 76 at 56). Dr. Lockey noted that

---

[2] The testimony of both defense experts was presented to the jury by way of a video-taped deposition played at trial. Dr. Rosenberg's deposition was taken on September 5, 2014 and Dr. Lockey's on September 22, 2014.

historically there was a "synergistic effect" identified between smoking and asbestos exposure and recent studies have "refined" the risk to show that people with asbestosis are at a higher risk than those with pleural plaques. (Doc. No. 77 at 26-29). Both experts stated their opinion that radiological evidence of asbestosis was necessary in order to causally relate lung cancer to asbestos. However, they both acknowledged that there was conflicting medical research regarding this issue.

### 1.   *Dr. Rosenberg*

{¶48} Dr. Rosenberg explained that asbestos only poses a danger when it is no longer encapsulated and becomes friable, meaning that the asbestos fibers become loose, are dispersed into the air, and can be inhaled into the lungs. He stated that only a small minority of people will develop an asbestos-related disease because the development of these disorders requires a significant exposure to friable asbestos over time.

{¶49} Dr. Rosenberg testified to the findings contained in his July 6, 2009 report which was based upon his examination of several documents, medical records and radiologic studies. During his testimony, he specifically discussed his review of a chest x-ray taken of Ivan on April 23, 2005, when Ivan was initially diagnosed with lung cancer. He also spoke of his review of a chest x-ray taken of Ivan on October 3, 2005, five months after Ivan was diagnosed with lung cancer.

Dr. Rosenberg noted evidence of scarring on Ivan's lungs which he attributed to the cancer and radiation from the cancer treatment. However, he concluded there was no evidence of asbestosis or asbestos-related pleural plaque formation. He further opined that Ivan did not have an asbestos-related disease or disorder and that Ivan's "lung cancer and ultimate demise were related to his long smoking history." (Doc. No. 76 at 39).

### 2. Dr. Lockey

{¶50} Dr. Lockey initially recalled his 2009 evaluation of a selected amount of Ivan's medical records, which he performed at the request of the Ohio Bureau of Worker's Compensation. He stated that the records were "relatively scanty." (Doc. No. 77 at 30). He was later provided with additional medical records pertaining to this litigation several days before his deposition. Dr. Lockey discussed his review of these records which contained the reports of radiologists and oncologists treating Ivan's lung cancer. He searched the documents for notations by the radiologists of changes in the x-rays or CT scans consistent with asbestos exposure, such as evidence of pleural plaques or interstitial fibrosis due to asbestos exposure.

{¶51} Dr. Lockey specifically discussed a CT scan report from April 23, 2005 wherein the treating radiologist identified "pleural plaques but no calcified pleural plaques" and "chronic interstitial lung patterns." (Doc. No. 77 at 32, Depo.

Ex. D, p. 356). Dr. Lockey determined these findings to be "nonspecific" and stated that calcification suggests the plaques have "been around for a long time." (Id. at 32). He also reviewed the April 23, 2005 CT scan and testified that he did not find any pleural plaques or interstitial changes consistent with the diagnosis of asbestosis. In addition, Dr. Lockey discussed his review of a chest x-ray taken of Ivan on October 3, 2005. Again, he noted markings in the x-ray film that he attributed to the lung cancer, but stated that he saw no indication of pleural plaques or other interstitial changes in Ivan's lungs consistent with asbestos exposure. Based on his review of Ivan's medical records along with various x-rays and CT scans pertaining to the diagnosis and treatment of Ivan's lung cancer, Dr. Lockey opined that Ivan's lung cancer was related to his "forty to eighty pack year history of cigarette smoking" and "the potential exposure to asbestos was not a significant contributing factor for his development of lung cancer." (Id. at 41).

### *Discussion*

{¶52} In examining the medical evidence pertaining to a causal relationship between Ivan's lung cancer and his employment at GM, we note all three experts testified that occupational exposure to airborne asbestos can lead to the development of lung cancer. It was also well-documented in the record that Ivan had a long history of smoking a pack to two packs of cigarettes a day, a habit which can also lead to the development of lung cancer. Thus, the critical issue as

-30-

it relates to causation is establishing a connection between Ivan's occupational exposure to asbestos at GM and his lung cancer.

{¶53} All three experts testified that the combination of an occupational exposure to asbestos and smoking significantly increases a person's risk of developing lung cancer as compared to the general population—i.e., smokers who are not exposed to asbestos and non-smokers who are occupationally exposed to asbestos. The majority of Ivan's medical records, including the radiologic studies, submitted at trial pertained to his diagnosis of lung cancer in 2005 and the subsequent cancer treatment until his death in 2007. Ivan's death certificate stated the cause of death as "Carcinoma of lung—metastatic to brain."[3] GM maintains that Ivan's long history of smoking was the only cause of Ivan's lung cancer. Both of their experts rendered opinions supporting this conclusion on the basis that they did not find any evidence of an asbestos-related disease in the radiologic studies.

{¶54} However, Dr. Rao identified specific characteristics on the x-rays he reviewed which he opined to be consistent with asbestosis and diaphragmatic plaques—both of which are markers of an asbestos-related disease. Specifically, Dr. Rao identified the presence of bilateral interstitial fibrosis due to asbestosis and pleural plaques in the lower portion of Ivan's left lung on the December 11,

---

[3] GM argues that the fact asbestosis was not included on Ivan's death certificate is somehow dispositive to prove that his lung cancer was not asbestos-related. However, Dr. Rao testified that it is not unusual for a secondary diagnosis of asbestosis to be omitted from the death certificate. (Doc. 79 at 130).

2000 x-ray—which was taken almost five years prior to Ivan's lung cancer diagnosis. (Doc. No. 79 at 88, Ex. 4). Dr. Rao distinguished the findings indicative of asbestos-related diseases from other evidence on the x-ray which he attributed to chronic obstructive pulmonary disease related to Ivan's smoking. According to Dr. Rao's testimony, there was radiologic evidence of Ivan having an asbestos-related disease years before he was diagnosed with lung cancer.

{¶55} All three experts also provided similar testimony regarding the latency period between the injurious exposure to asbestos and the development of an asbestos-related disease. Dr. Rao also reviewed much of the same medical evidence as GM's experts and reached a different conclusion regarding the characteristics of the radiologic changes; specifically, where GM's experts attributed those changes solely to Ivan's lung cancer, Dr. Rao distinguished the progression of the asbestos-related diseases from the changes associated with the lung cancer and its treatment.

{¶56} Given this evidence, a reasonable juror could conclude that Ivan developed lung cancer as a result of his employment with GM. The question of whether the medical evidence supports the conclusion that Ivan had an asbestos-related disease which contributed to the development of his lung cancer could reasonably be resolved either way. The parties put on a "battle of the doctors." Which doctors to believe was up to the jury to decide. Construing the evidence

most strongly in favor of Loretta, we find that she presented sufficient evidence to support the jury's verdict that she was entitled to participate in the Ohio Workers' Compensation System for Ivan's condition of asbestos-related lung cancer. Therefore, because reasonable minds could have reached more than one conclusion based on the evidence submitted, GM was not entitled to judgment as a matter of law, and the trial court properly denied GM's motion for directed verdict. Accordingly, GM's first assignment of error is overruled.

### *Second and Third Assignments of Error*

**{¶57}** On appeal, GM argues that the trial court erred in admitting certain evidence at trial. We review the trial court's rulings on admissibility of evidence under an abuse of discretion standard. *Estate of Johnson v. Randall Smith, Inc.*, 135 Ohio St.3d 440, 2013-Ohio-1507, ¶ 22. Presuming that the trial court is in a better position to evaluate the evidence and assess its credibility, we will not reverse the trial court's evidentiary ruling unless it was "contrary to law, unreasonable, not supported by the evidence, or grossly unsound." *Schwarck v. Schwarck*, 3d Dist. Auglaize No. 2-11-24, 2012-Ohio-3902, ¶ 16.

### *Plaintiff's Exhibits 5 and 6*

**{¶58}** GM claims the trial court erred in admitting Plaintiff's Exhibits 5 and 6 at trial. Both of these exhibits were documents produced by GM during the course of discovery and tend to establish the presence of asbestos at GM's

Defiance facility. It should be noted the record suggests that over a matter of several months GM impeded the discovery process by refusing to comply with numerous requests for discovery. It is only after the trial court finally ruled in favor of Loretta on these issues that GM produced the documents at issue.

{¶59} Exhibit 5 is a six-page document detailing GM's safety policy for the prevention of exposure to asbestos fibers which was implemented in March of 2006. Exhibit 6 is entitled "Asbestos Removal Summary" and lists the removal of specific amounts of asbestos by department and date. The list spans as far back as 1981 and extends into 2011. GM argues that the documents are not relevant and are unduly prejudicial because they cover a timeframe which is outside of Ivan's employment with GM and do not indicate whether the asbestos removed was friable or otherwise hazardous.

{¶60} Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). We are not persuaded by GM's complaints regarding the admissibility of these documents. The existence of asbestos at the GM facility is a fact of consequence to the determination of this action. These

documents produced by GM were therefore relevant in tending to establish this fact which was essential to Loretta proving her claim.

{¶61} Moreover, GM has failed to persuade us that the admission of these exhibits somehow had a prejudicial effect on its case based on its own assertions that asbestos is not dangerous unless is its friable and airborne. These documents only establish the mere presence of asbestos in the facility and do not specify the condition of any of the products. Moreover, the jury heard extensive expert testimony distinguishing the safety of encapsulated asbestos from the hazards of friable asbestos and explaining the presence of a nominal amount of asbestos to which the public is generally exposed that poses no danger or health risks. Thus, we find no support for GM's position that the admission of these documents permitted the jury to make an improper inference regarding Ivan's injurious exposure to asbestos. Therefore, we are not convinced by GM that the trial court's admission of this evidence was so unreasonable, arbitrary, or unconscionable that it was an abuse of discretion. *See Cunningham v. Goodyear Tire & Rubber Co.*, 104 Ohio App. 3d 385, 391 (9th Dist.1995) (finding no abuse of discretion in a trial court's decision to admit evidence of an employer's asbestos removal after decedent's employment). Accordingly, GM's second assignment of error is overruled.

### *Dr. Rao's Expert Opinion*

**{¶62}** GM also argues that the trial court erred in admitting Dr. Rao's expert opinion over its objection on the basis that his testimony assumed facts not in evidence. GM claims that Dr. Rao's expert opinion finding a causal relationship between Ivan's work responsibilities at GM and his lung cancer should have been stricken because it was based on the assumption of three facts: (1) that Ivan "worked for General Motors from approximately 1973 to 2001;" (2) that Ivan "was occupationally exposed to and breathed in asbestos dust and fibers while working for GM between 1973 and 2001;" and (3) that Ivan "smoked one to two packs of cigarettes a day for approximately 47 years." (Doc. No. 79 at 70-71).

**{¶63}** "Experts have the knowledge, training and experience to enlighten the jury concerning the facts and their opinion regarding the facts." *Ramage v. Cent. Ohio Emergency Servs., Inc.*, 64 Ohio St.3d 97, 102 (1992), citing *McKay Machine Co. v. Rodman*, 11 Ohio St.2d 77 (1967). Ohio Evidence Rule 703 provides that the "facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by the expert or admitted in evidence at the hearing." *See also* Evid.R. 705 (providing "[t]he expert may testify in terms of opinion or inference and give the expert's reasons therefor after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question or otherwise").

{¶64} The contents of a hypothetical question posed to an expert witness must fairly reflect the facts established by the evidence and upon which the witness is prepared to give an opinion. *Price v. Daugherty*, 5 Ohio App.3d 157, 158–59 (2d Dist.1982), citing *Surman v. Ohio & Pennsylvania Oil & Gasoline Co.*, 116 Ohio App. 453 (8th Dist.1962), paragraph four of the syllabus. Thus, the facts underlying an expert's opinion must be either part of the expert's personal knowledge or admitted into evidence at the hearing or trial. *Frazier v. Ohio State Univ. Hosp.*, 10th Dist. No. 95API06-774 (Dec. 19, 1995). "If there is no evidence to support an assumed fact * * *, the trial judge should intervene and sustain an objection to the use of a hypothetical question containing such fact." *Price* at 160.

{¶65} "Where there is conflict in the evidence concerning the existence of a fact which is material to the expert's forming an opinion, counsel propounding the hypothetical question is entitled to include as an assumed fact his version of the evidence on the disputed fact. It is then for the trier of the facts to resolve the factual dispute and, depending upon its findings, to determine what weight it will give to the opinion-answer." *Mayhorn v. Pavey*, 8 Ohio App.3d 189, 191-192 (1982).

{¶66} At trial, Loretta provided evidence in support of each hypothetical question asked of Dr. Rao in rendering his expert medical opinion. On appeal,

GM specifically takes issue with Dr. Rao assuming the fact that Ivan "was occupationally exposed to and breathed in asbestos dust and fibers while working for GM between 1973 and 2001." However, as discussed in the resolution of the first assignment of error, we found there was substantial evidence presented at trial to sufficiently establish Ivan's occupational asbestos exposure at GM to permit the issue to be determined by the jury. Thus, there was independent evidence in the record to support Dr. Rao's assumption on this disputed fact. Accordingly, we find no abuse of discretion in the trial court's decision to allow the trier of the fact to resolve the factual dispute as to the issue of Ivan's occupational asbestos exposure and to determine the weight to accord Dr. Rao's expert opinion. GM's third assignment of error is also overruled.

{¶67} For all these reasons the judgment is affirmed.

*Judgment Affirmed*

**ROGERS, P.J. and PRESTON, J., concur.**

**/jlr**