[Cite as *Balister v. C\*Mac Transp., L.L.C.*, 2022-Ohio-3874.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## AUGLAIZE COUNTY

THOMAS BALISTER ET AL.,

    PLAINTIFFS-APPELLANTS,           CASE NO.  2-22-06

    v.

C\*MAC TRANSPORTATION, LLC,
ET AL.,                                O P I N I O N

    DEFENDANTS-APPELLEES.

---

**Appeal from Auglaize County Common Pleas Court**
**Trial Court No. 2021 CV 0021**

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

**Date of Decision:    October 31, 2022**

---

APPEARANCES:

    *Royce A. Link* for Appellants

    *Kevin J. Plagens* for Appellee, C\*Mac Transportation, LLC

    *Zachary D. Maisch* for Appellee, Big Daddy's Towing

Case No. 2-22-06

**MILLER, J.**

**{¶1}** Appellants, Thomas Balister and Roadway Logistic Systems Co. ("Roadway"), appeal the February 16, 2022 judgment of the Auglaize County Court of Common Pleas granting appellee, C*Mac Transportation, LLC's, motion for directed verdict and separately granting appellee, Big Daddy's Towing's, motion for directed verdict. For the reasons that follow, we affirm in part and reverse in part.

## I. Facts[1] & Procedural History

**{¶2}** Roadway is a duly organized Ohio corporation. C*Mac Transportation, LLC ("C*Mac") is a duly organized Michigan limited liability company. In 2016, Roadway purchased a 2003 Volvo tractor from C*Mac. On August 25, 2016, Roadway leased the 2003 Volvo tractor to C*Mac pursuant to a written "Exclusive Operating Agreement with Independent Contractor for Transportation Services" (the "Agreement"). As relevant to this case, the Agreement provided:

**2. EQUIPMENT AND OPERATIONS**

**A.   THE EQUIPMENT**

* * * As required by 49 C.F.R. 376.12(c)(1), this Agreement recites, and parties accordingly agree, that Company [i.e., C*Mac] will have possession, use, and control of the equipment to the extent required by such regulation during the term of this Agreement.

---

[1] Given the procedural posture of this case—an appeal from the trial court's grant of motions for directed verdict after Balister and Roadway's opening statement—the background of this case is drawn solely from that opening statement, the pleadings, and, to a very limited extent, the parties' arguments on C*Mac's and Big Daddy's Towing's motions for directed verdict.

* * *

## C. OPERATING EXPENSE

Contractor [i.e., Roadway] agrees to bear all costs and expenses incidental to operation of the [2003 Volvo], whether empty or loaded, including, without limitation, all risks of depreciation, all maintenance (including cleaning and washing), fuel oil, tires, repairs, business taxes, consumption and sales taxes, personal property taxes, ad valorem taxes, fuel and road-use taxes, ton-mile taxes, insurance coverage as required herein, workers compensation premiums if required, payroll taxes, * * * licenses, vehicle registration fees, trailer registration fees, base plates, and all highway, bridge and ferry tolls, as well as costs of empty mileage, detention and accessorial services. * * *

## D. OPERATION OF THE EQUIPMENT

* * * [C*Mac] shall be considered to have such exclusive possession, use and control of the [2003 Volvo] required by 49 C.F.R. 376.12(o)(1) [sic], or other applicable regulations, but shall have no further right or authority to operate the [2003 Volvo] for any purpose without the express permission of [Roadway] (except for incidental yard movement or positioning). * * *

* * *

## 4. INSURANCE AND INDEMNIFICATION

* * *

## C. COMPANY'S NON LIABILITY FOR EQUIPMENT

[Roadway] agrees that [C*Mac] shall not be liable to [Roadway] for any intentional, unintentional, negligence, depreciation, loss or damage that may occur to [Roadway's 2003 Volvo] by collision, fire, theft, or similar occurrence.

(Capitalization and boldface sic.) (Complaint, Ex. 1). Balister signed the Agreement on a line provided for "Contractor Signature."

{¶3} On March 17, 2017, Balister was operating the 2003 Volvo, traveling south on Interstate 75 in Auglaize County, and hauling a trailer belonging to C*Mac. At that time, a vehicle traveling north on Interstate 75 crossed the median into southbound traffic, causing a multi-car crash involving the 2003 Volvo. After the crash, Balister contacted a representative for C*Mac, and the C*Mac representative subsequently contacted Big Daddy's Towing. The C*Mac representative "called [Balister] back after five minutes and told [him] at that point that they had contacted Big Daddy's and arranged for [a] tow." (Balister & Roadway's Opening Statement, Feb. 15-16, 2022 Tr. at 68). Balister was then taken by ambulance to a hospital in Sidney, Ohio. At some point, Balister was picked up from the hospital, and as he traveled north toward his home, he passed by the scene of the accident.

{¶4} For several weeks after the accident, Balister took no action concerning the 2003 Volvo, but on or about April 14, 2017, Balister contacted Big Daddy's Towing and asked to retrieve the vehicle. At that time, Balister learned that C*Mac had requested that Big Daddy's Towing split its bill for the towing services rendered for the 2003 Volvo tractor and C*Mac's trailer, and that C*Mac had already retrieved its trailer and paid the portion of the bill associated with the trailer. However, C*Mac had not paid the tractor-related portion of the bill, and Big

Daddy's Towing refused to release the 2003 Volvo until this portion of the bill was paid. Balister "indicated that he believed that it was the responsibility of C*Mac Transportation to pay the towing bill associated with the truck, and he also indicated that the split between the truck and the trailer was not appropriate * * *." (Balister & Roadway's Opening Statement, Feb. 15-16, 2022 Tr. at 70). C*Mac nevertheless refused to pay for the tractor-related portion of Big Daddy's Towing's bill. As of February 2022, the tractor-related portion of the bill had yet to be paid, and the 2003 Volvo remained on Big Daddy's Towing's lot.

{¶5} On March 3, 2021, Balister and Roadway filed a complaint naming C*Mac and Big Daddy's Towing as defendants. As against C*Mac, Balister and Roadway asserted that C*Mac violated federal law, specifically the provisions of the federal Truth-in-Leasing ("TIL") regulations, by failing to pay for the tractor-related charges and by omitting certain language from the Agreement that is required by the TIL regulations. *See generally* 49 C.F.R. 376.12. Additionally, Balister and Roadway alleged that C*Mac had breached the Agreement by refusing to pay for the tractor-related charges. Balister and Roadway also claimed that the bill split requested by C*Mac was improper as it "failed to reflect the actual costs of recovering the trailer, which lost its tandems and required substantial additional labor and costs to recover[], and the costs to recovery of the semi-tractor itself." (Complaint at ¶ 30). With respect to Big Daddy's Towing, Balister and Roadway

did not assert any claims. They instead requested an order from the trial court directing Big Daddy's Towing to "plead any right or interest" it had in the matter. (Complaint at ¶ 43).

{¶6} On March 22, 2021, Big Daddy's Towing filed its answer to Balister and Roadway's complaint. In addition, Big Daddy's Towing filed a counterclaim against Balister and Roadway asserting that it had provided towing and recovery services to Balister and Roadway for which it was owed $9,157.20. Big Daddy's Towing further claimed that Balister and Roadway were responsible for storage charges in the amount of $50 per day since the 2003 Volvo was towed to Big Daddy's Towing's lot in March 2017.

{¶7} On April 12, 2021, Balister and Roadway filed their answer to Big Daddy's Towing's counterclaim. On May 12, 2021, C*Mac filed its answer to Balister and Roadway's complaint.

{¶8} The matter proceeded to a jury trial on February 15, 2022. Following Balister and Roadway's opening statement, both C*Mac and Big Daddy's Towing moved for a directed verdict under Civ.R. 50(A). After the trial court indicated its intention to grant the motions, Balister and Roadway moved the trial court to allow them to amend their opening statement. The trial court rejected Balister and Roadway's request but allowed their counsel to proffer for the record their proposed additions to their opening statement.

{¶9} The trial court then granted C\*Mac's motion in its entirety, entering judgment in C\*Mac's favor on Balister and Roadway's TIL claims and on their breach-of-contract claim. The trial court also granted Big Daddy's Towing's motion in part. Specifically, the trial court concluded that Balister and Roadway were liable to Big Daddy's Towing for the initial towing and recovery services and for storage charges from March 17, 2017, through April 14, 2017. However, the trial court determined that "[s]ince the exact amount of [the] bill [was] not included in the opening statement and was not consented to, the amount of such towing and storage through April 14, 2017, [would] be determined by the finder of fact or later by this court upon the conclusion of the evidence \* \* \*." (Doc. Nos. 79, 88). Furthermore, the trial court found that "[s]ince the storage of the vehicle since April 14 [was] contested, the court [would] not grant a directed verdict upon the opening statements but instead those issues related to the storage charges after April 14, 2017, [would] be determined by the jury or by the Court in accordance with the Civil Rules." (Doc. Nos. 79, 88). The trial court filed its judgment entry on the motions for directed verdict on February 16, 2022.

{¶10} Following the trial court's grant of C\*Mac's and Big Daddy's Towing's motions for directed verdict, the remaining issues were tried to the jury. On February 16, 2022, the jury returned a verdict against Balister and against Roadway. The jury awarded Big Daddy's Towing $9,157.20 for "the reasonable

value of the services provided by Big Daddy's Towing for Plaintiffs' [2003 Volvo] on March 17, 2017," and $49,725 for "the reasonable value of the storage services provided by Big Daddy's Towing for Plaintiffs' [2003 Volvo] from March 17, 2017," through the date of trial. (Doc. Nos. 85, 86). The trial court filed its final judgment entry on February 22, 2022.

## II. Assignments of Error

{¶11} On March 9, 2022, Balister and Roadway filed a notice of appeal. They raise the following three assignments of error for our review:

**1. The trial court erred as a matter of law by granting C\*Mac Transportation's motion for directed verdict at the close of opening statements.**

**2. The trial court erred as a matter of law by granting Big Daddy's Towing's motion for directed verdict at the close of opening statements.**

**3. The trial court abused its discretion by not allowing Roadway Logistic Systems and Thomas Balister to amend their opening statement.**

Because Balister and Roadway's three assignments of error concern interrelated issues, we address them together.

## III. Discussion

{¶12} In their first and second assignments of error, Balister and Roadway claim that the trial court erred by granting C\*Mac's and Big Daddy's Towing's motions for directed verdict. Regarding the trial court's decision to grant C\*Mac's

motion, Balister and Roadway maintain that the trial court erred in its application of the TIL regulations, that the trial court misinterpreted the Agreement to conclude that C*Mac had no contractual duty to pay for the tractor-related charges, and that the trial court erred by not addressing the bill-split issue in its decision granting C*Mac's motion. As to the trial court's decision partially granting Big Daddy's Towing's motion for directed verdict, Balister and Roadway contend that the trial court again erred by failing to address the bill-split issue, that the trial court was mistaken to hold Balister personally liable for the tractor-related charges, and that the trial court erred by finding that the elements for a quasi-contract were demonstrated via their opening statement. In their third assignment of error, Balister and Roadway argue that the trial court erred by not allowing them to amend their opening statement "to supply missing facts" that would have affected the trial court's determination of the issues.

**A. Civ.R. 50(A) & Standards for Reviewing Motions for Directed Verdict**

{¶13} "We employ a de novo standard of review in evaluating the grant or denial of a motion for a directed verdict." *Bryant v. Gen. Motors Corp.*, 3d Dist. Defiance No. 4-15-03, 2015-Ohio-4911, ¶ 10. "De novo review is independent and without deference to the trial court's determination." *ISHA, Inc. v. Risser*, 3d Dist. Allen No. 1-12-47, 2013-Ohio-2149, ¶ 25.

{¶14} "Once a jury has been convened and trial has started, a party may no longer file a motion for judgment on the pleadings or for summary judgment. That time has passed. But a motion for directed verdict may be possible." *Parrish v. Jones*, 138 Ohio St.3d 23, 2013-Ohio-5224, ¶ 14. Motions for directed verdict are brought under Civ.R. 50(A), which provides in part that "[a] motion for a directed verdict may be made on the opening statement of the opponent, at the close of the opponent's evidence or at the close of all the evidence." Civ.R. 50(A)(1).

> Motions for directed verdict are most commonly made after an opponent's case in chief or at the close of all evidence. Civ.R. 50(A)(4) sets forth a standard for granting a motion for directed verdict made *after evidence* has been submitted: "[A]fter construing the evidence most strongly in favor of the party against whom the motion is directed, * * * reasonable minds could come to but one conclusion upon the evidence submitted."

(Emphasis sic.) *Parrish* at ¶ 16. However, Civ.R. 50(A) does not set forth a standard for instances, like this one, where a motion for directed verdict is made at the earliest possible time, i.e., at the close of the nonmovant's opening statement. *Id.* at ¶ 17. Nevertheless, the Supreme Court of Ohio has provided guidance for the determination of such motions.

{¶15} To begin, "[a] trial court should exercise great caution in sustaining a motion for a directed verdict on the opening statement of counsel[.]" *Brinkmoeller v. Wilson*, 41 Ohio St.2d 223 (1975), syllabus. As a rule, "motions for directed verdict made following an opening statement will be granted only in rare instances."

*Parrish* at ¶ 34. "[I]t must be clear that all the facts expected to be proved, and those that have been stated, do not constitute a cause of action or a defense, and the statement must be liberally construed in favor of the party against whom the motion has been made." *Brinkmoeller* at syllabus.

{¶16} A question arises, however, concerning whether a trial court is limited solely to the opening statement to find the "facts" constituting the nonmovant's cause of action or defense or whether the trial court can also look to the pleadings. "A motion for directed verdict made at the conclusion of an opponent's opening statement focuses on what has been said during the opening statement." *Parrish* at ¶ 21. When a litigant moves for directed verdict after their opponent's opening statement, "the trial court may be able to dispose of the motion solely upon the basis of the statement and without consulting the pleadings" if "an assertion is made during opening statement that indicates that the party will be unable to sustain its claim or defense at trial." *Id.* at ¶ 23 and 27. Accordingly, when ruling on a motion for directed verdict made after an opponent's opening statement, the trial court "is not required to consider the allegations contained in the pleadings." *Id.* at ¶ 23. However, although the trial court's first and foremost focus should be on the contents of the nonmoving party's opening statement, this does not mean that a trial court is precluded from considering the pleadings in an appropriate case. While "a trial court is not required to consider the allegations contained in the pleadings along

with the opening statement when ruling on a Civ.R. 50(A) motion for directed verdict, * * * in liberally construing the opening statement in favor of the [nonmoving party], a trial court may consult the pleadings." *Id.* at ¶ 37.

**B. C\*Mac's Civ.R. 50(A)(1) Motion & the Trial Court's Decision**

**{¶17}** When it moved for a directed verdict on Balister and Roadway's claims under the federal TIL regulations, C\*Mac asserted that "49 C.F.R. 376.12(c)(1) doesn't provide an independent cause of action for [Balister and Roadway] regarding towing [and] storage." (Argument on Motions for Directed Verdict, Feb. 15-16, 2022 Tr. at 82). Regarding Balister and Roadway's breach-of-contract claim, C\*Mac argued that a directed verdict was warranted because the Agreement did not contain any provisions "articulat[ing] that C\*Mac Transportation is to pay for any of the [tractor-related towing and storage] expenses or damages." (Argument on Motions for Directed Verdict, Feb. 15-16, 2022 Tr. at 84-85).

**{¶18}** In granting C\*Mac's Civ.R. 50(A)(1) motion, the trial court dealt with Balister and Roadway's TIL claims as follows:

> This case involves the application of the terms of the contract between Plaintiffs and C\*Mac. While Plaintiffs claim that 49 C.F.R. 376.12(c) was breached in the formation of the lease agreement, this Court notes that 49 C.F.R. 376.12 only creates a separate cause of action within the authority found within 49 U.S.C. 14102 which does not cover this situation. Plaintiffs admit that there is no Order of the Board or of the Secretary that was issued with respect to this issue or these parties, and Plaintiffs have not pled the same.

(Doc. Nos. 79, 88).

**{¶19}** The trial court then turned to Balister and Roadway's breach-of-contract claim, noting that the Agreement was attached to Balister and Roadway's complaint and that they referenced the Agreement in their opening statement. (Doc. Nos. 79, 88). The trial court then quoted Section 4(C) of the Agreement (reproduced above) and thereafter concluded regarding the breach-of-contract claim:

> When applying the standard set forth in Civil Rule 50, the Court finds that * * * nothing in the contract as written and agreed to between the parties requires the lessee, C*Mac, to repair Plaintiffs' semi-tractor, or to tow it or to store it * * *. Nothing in the contract makes C*Mac responsible for the towing bill incurred by Plaintiffs. Indeed, while C*Mac called the towing company, it was based upon its dispatcher assisting Plaintiffs in getting help prior to Balister being transported to the hospital. Balister went back after treatment directly by the scene while the scene was still being cleared and Balister did not direct Big Daddy's to tow his tractor to any alternative location (see R.C. 4513.60 et seq.) but instead accepted the services of Big Daddy's.
>
> Nothing in their Complaint or pleadings, including their answer to the counterclaim of Big Daddy's Towing, indicates any challenge to the reasonableness of the towing or storage bill. Plaintiffs' claim is simply that C*Mac owes the bill, not them.

 (Doc. Nos. 79, 88).

### i. Violations of the TIL Regulations

**{¶20}** In determining whether the trial court erred by granting C*Mac's motion for directed verdict on Balister and Roadway's TIL claims, we begin, where we must, with Balister and Roadway's opening statement. In the opening statement,

Balister and Roadway's counsel stated that the jury would hear about "a federal code called the Truth-in-Leasing Act, 49 C.F.R. 376, which requires that C*Mac Transportation have possession, use, and control of the equipment during the course of the lease." (Balister & Roadway's Opening Statement, Feb. 15-16, 2022 Tr. at 74). He further stated that the TIL regulations "require[] that, 'The lease shall provide that the authorized carrier assume complete responsibility of the operation of the equipment for the duration of the lease.' And so we believe it's [C*Mac's] responsibility to make that payment." (Balister & Roadway's Opening Statement, Feb. 15-16, 2022 Tr. at 76). Finally, Balister and Roadway's counsel said that Balister and Roadway were asserting "claims for the federal code portions of that not being included in the contract regarding who's obligated to pay" for the tractor-related towing and storage charges. (Balister & Roadway's Opening Statement, Feb. 15-16, 2022 Tr. at 77). The omitted provision referenced by Balister and Roadway's counsel was one requiring C*Mac to assume "complete responsibility" for operation of the 2003 Volvo.

{¶21} Therefore, as reflected in Balister and Roadway's opening statement, Balister and Roadway made two separate TIL claims: (1) that C*Mac's refusal to pay for the tractor-related towing and storage charges was itself a violation of the TIL regulations and (2) that C*Mac violated the TIL regulations by failing to include the "complete responsibility" language in the Agreement. The question is

-14-

whether these TIL claims, as articulated in Balister and Roadway's opening statement, constituted causes of action Balister and Roadway might have been capable of sustaining at trial. To answer this question, we must look to the TIL regulations themselves and to the cases interpreting and applying them.

**{¶22}** "Congress regulates leases between independent truckers and federally regulated motor carriers * * *, requiring, among other things, that the leases be in writing and specify their duration and the compensation that the carrier will pay the trucker." *Fox v. Transam Leasing, Inc.*, 839 F.3d 1209, 1211 (10th Cir.2016); *see* 49 U.S.C. 14102(a). "Congress has tasked the Department of Transportation ("DOT") with further regulating these leases; the DOT does so through its Federal Motor Carrier Safety Administration and its truth-in-leasing regulations." *Fox* at 1211; *see* 49 C.F.R. Pt. 376.

**{¶23}** "The truth-in-leasing regulations protect independent truckers from motor carriers' abusive leasing practices." *Fox* at 1211.

> [T]he objectives of the regulations are "to promote truth-in-leasing— a full disclosure between the carrier and the owner-operator of the elements, obligations, and benefits of leasing contracts signed by both parties; * * * to eliminate or reduce opportunities for skimming and other illegal or inequitable practices by motor carriers; and * * * to promote the stability and economic welfare of the independent trucker segment of the motor carrier industry."

*Id.* at 1211-1212, quoting *In re Arctic Express Inc.*, 636 F.3d 781, 796 (6th Cir.2011). It is undisputed that C*Mac is a federally regulated motor carrier subject to the requirements of the TIL regulations.

{¶24} The specific TIL regulation implicated in Balister and Roadway's opening statement provides:

> [T]he written lease required under § 376.11(a)[2] shall contain the following provisions. The required lease provisions shall be adhered to and performed by the authorized carrier.
>
> * * *
>
> (c)  Exclusive possession and responsibilities.
>
> (1)  The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease.
>
> * * *
>
> (4)  Nothing in the provisions required by [49 C.F.R. 376.12(c)(1)] is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. 14102[3] and attendant administrative requirements.

---

[2] "[T]he authorized carrier may perform authorized transportation in equipment it does not own only under the following conditions: * * * There shall be a written lease granting the use of the equipment and meeting the requirements contained in § 376.12." 49 C.F.R. 376.11(a).

[3] Among other things, 49 U.S.C. 14102 provides that the Secretary of the Department of Transportation "may require a motor carrier providing transportation subject to jurisdiction under subchapter I of chapter 135 that uses motor vehicles not owned by it to transport property under an arrangement with another party to * * * have control of and be responsible for operating those motor vehicles in compliance with requirements prescribed by the Secretary on safety of operations and equipment, and with other applicable law as if the motor vehicles were owned by the motor carrier." 49 U.S.C. 14102(a)(4).

49 C.F.R. 376.12(c)(1) and (4). Regulations containing provisions identical or similar to those contained in 49 C.F.R. 376.12(c)(1) have been on the books for many decades and were adopted to remedy a pervasive problem in the American trucking industry:

> During the first half of the twentieth century, interstate motor carriers attempted to immunize themselves from liability for negligent drivers by leasing trucks and nominally classifying the drivers who operated the trucks as "independent contractors." In order to protect the public from the tortious conduct of the often judgment-proof truck-lessor operators, Congress in 1956 * * * require[d] interstate motor carriers to assume full direction and control of the vehicles that they leased "as if they were the owners of such vehicles." The purpose * * * was to ensure that interstate motor carriers would be fully responsible for the maintenance and operation of the leased equipment and the supervision of the borrowed drivers, thereby protecting the public from accidents, preventing public confusion about who was financially responsible if accidents occurred, and providing financially responsible defendants. As a result of [this] regulatory authority * * *, the [now defunct] Interstate Commerce Commission (ICC)[4] issued regulations that require a certificated interstate carrier who leases equipment to enter into a written lease with the equipment owner [containing the provisions now set forth in 49 C.F.R. 376.12(c)(1)].

(Citations omitted.) *Morris v. JTM Materials, Inc.*, 78 S.W.3d 28, 37-38 (Tex.App.2002). While the addition of 49 C.F.R. 376.12(c)(4) in 1992 explicitly authorized independent-contractor relationships between motor carriers and independent owner-operators, it "did not * * * eliminate carrier responsibility and

---

[4] "On January 1, 1996, the ICC ceased to exist and its duties were transferred to the Surface Transportation Board * * *." *Birt v. Surface Transp. Bd.*, 90 F.3d 580, 582 (D.C.Cir.1996), fn. 2.

liability for the use of leased trucks." *Amerigas Propane, L.P. v. Landstar Ranger, Inc.*, 184 Cal.App.4th 981, 995 (Cal.Ct.App.2010).

**{¶25}** We conclude that the trial court correctly directed a verdict in favor of C*Mac on Balister and Roadway's TIL claims because these claims, as articulated in Balister and Roadway's opening statement, were entirely unsustainable as a matter of law.[5] Specifically, Balister and Roadway's first TIL claim was untenable because motor carrier lessees like C*Mac are not obligated by 49 C.F.R. 376.12(c)(1) to pay for towing and storage costs incurred by an independent owner-operator lessor during the term of the lease. Furthermore, under the circumstances

---

[5] In its decision, the trial court appeared to refer to 49 U.S.C. 14704, which provides:

    (a) In general.

    (1) Enforcement of order. A person injured because a carrier or broker providing transportation or service subject to jurisdiction under chapter 135 does not obey an order of the Secretary [of the Department of Transportation] or the [Surface Transportation] Board, as applicable, under this part, except an order for the payment of money, may bring a civil action to enforce that order under this subsection. A person may bring a civil action for injunctive relief for violations of sections 14102, 14103, and 14915(c).

    (2) Damages for violations. A carrier or broker providing transportation or service subject to jurisdiction under chapter 135 is liable for damages sustained by a person as a result of an act or omission of that carrier or broker in violation of this part.

49 U.S.C. 14704(a). The trial court seemingly relied on 49 U.S.C. 14704(a)(1) to conclude that, in the absence of an order of the Secretary or the Board, Balister and Roadway could not maintain a cause of action for violations of the TIL regulations. But this is not the case. TIL claimants are "not required to obtain an administrative order prior to instituting suit." *Owner-Operator Indep. Drivers Assn. v. C.R. England, Inc.*, 325 F.Supp.2d 1252, 1264 (D.Utah 2004), following *Owner-Operator Indep. Drivers Assn. v. New Prime, Inc.*, 192 F.3d 778 (8th Cir.1999). Even without an order from the Secretary or Board, 49 U.S.C. 14704(a)(2) "authorizes private parties to sue for damages for carrier conduct 'in violation of [regulations promulgated under] this part,'" including the TIL regulations. (Bracketing in original.) *New Prime* at 784-785. Thus, in concluding that Balister and Roadway had no viable cause of action for violations of the TIL regulations for the sole reason that there was no standing order of the Secretary or Board to enforce, the trial court erred.

of this case, C*Mac's failure to include the "complete responsibility" language in the Agreement did not give rise to a cognizable TIL claim.

**{¶26}** The few cases discussing 49 C.F.R. 376.12(c)(1), or like regulations, support that the "exclusive possession, control, and use" and "complete responsibility" provisions of 49 C.F.R. 376.12(c)(1) were not adopted to protect owner-operator lessors by making motor carrier lessees financially liable for certain expenses and other costs incident to operation of the lessor's vehicle, such as the towing and storage costs at issue here, incurred by the lessor during the term of the lease agreement. For example, in *Halvorsen v. Kosiboski*, an independent owner-operator lessor, Kosiboski, was involved in an accident with another driver, Halvorsen. *Halvorsen v. Kosiboski*, N.D.Ill. No. 88 C 10739, 1989 WL 135194, *1 (Nov. 2, 1989). At the time of the accident, Kosiboski was displaying the placards of his motor carrier lessee, Eastern Refrigerated Express ("Eastern"). *Id.* Halvorsen sued Kosiboski for negligence, and Kosiboski filed a third-party complaint seeking indemnification from Eastern. *Id.* Kosiboski claimed that the former provisions of 49 C.F.R. 1057.12(c)(1), which were identical to the provisions of 49 C.F.R. 376.12(c)(1), created a duty for Eastern to indemnify him.

**{¶27}** The court rejected Kosiboski's argument, reasoning:

> The complete responsibility provision is primarily intended to protect the public, not a lessor such as Kosiboski. Thus, in *[Transamerican] Freight Lines, Inc. v. Brada Miller Freight Systems, Inc.*, 423 U.S. 28, 96 S.Ct. 229 (1976), the Supreme Court held that the complete

responsibility a carrier must assume refers to the responsibility it owes to "the public, the shipper and the ICC." *Id.*, 96 S.Ct. at 235. The Seventh Circuit has also emphasized the role of the regulation in protecting the interests of the public. "The purpose of the federal statute and regulation is to ensure that an ICC carrier has independent financial responsibility to pay losses sustained by the general public arising out of its trucking operations." *Travelers Insurance Co. v. Transport Insurance Co.*, 787 F.2d 1133, 1140 (7th Cir.1986)[.]

These cases make it clear that the primary emphasis of the complete responsibility provision is the protection of the injured party. In the context of the present case, the provision would operate to create a duty flowing from Eastern to Halvorsen. However, Halvorsen has chosen not to invoke the protection provided by the complete responsibility provision and proceeds against the parties she believes to be ultimately responsible; Kosiboski and [a cargo broker Kosiboski was working with]. Halvorsen's decision to forego [sic] this protection does not enable Kosiboski to use the complete responsibility provision as a sword against Eastern. *See Travelers Insurance Co.*, 787 F.2d at 1140 (explaining that the provision could not be invoked by an insurance company because protecting the interests of the public was no longer at stake), citing *Carolina Casualty Insurance Co. v. Underwriters Insurance Co.*, 569 F.2d 304 (5th Cir.1978).

On the contrary, the Seventh Circuit has instructed that, when the interests of the public are not implicated, the relevant inquiry shifts away from a construction of the * * * regulations. Once it is clear that the interests of the injured party are protected, questions involving the allocation of losses are decided by reference to the private agreements between the parties and principles of state law. *Travelers Ins. Co.*, 787 F.2d at 1140.

*Id.* at *2.

{¶28} In addition, in *Transamerican Freight*, which the court in *Halvorsen* cited in support of its conclusion, the Supreme Court of the United States was asked to decide whether a "control and responsibility" regulation similar to 49 C.F.R.

-20-

376.12(c)(1) prohibited, as against public policy, a lease provision requiring an independent owner-operator lessor to indemnify a motor carrier lessee for loss caused by the lessor's negligence. In concluding that such a provision did not necessarily contravene the "control and responsibility" regulation, the court approvingly cited the following statement from the ICC:

> "It now seems to be accepted that when an authorized carrier furnishes service in vehicles owned and operated by others, he must control the service to the same extent as if he owned the vehicles, *but need control the vehicles only to the extent necessary to be responsible to the shipper, the public, and this Commission for the transportation*."

(Emphasis added.) *Transamerican Freight* at 39. The court thus concluded that the "mere presence of [an indemnification] clause such as the one here that the lessor is to bear the burden of its own negligence does not, in and of itself, offend the regulations so long as the lessee does not absolve itself from the duties to the public and to shippers imposed upon it by the Commission's regulations." *Id.* at 40.

{¶29} Thus, 49 C.F.R. 376.12(c)(1) is a distinctly public-facing regulation. It ensures that when a member of the public suffers an injury connected to the motor carrier lessee's trucking operation, there is at least one responsible entity to which the injured party can look for redress. But as the Supreme Court suggested, the motor carrier lessee need only have control of and responsibility for the lessor's vehicle to the extent necessary to protect the public, and no further. Hence, where the public interest is not at stake, or where the public interest is fully secured without

needing to implicate the motor carrier lessee, 49 C.F.R. 376.12(c)(1) ceases to be relevant. In this case, the dispute over Balister's, Roadway's, and C*Mac's respective responsibilities for paying the tractor-related towing and storage charges is essentially a commercial disagreement between knowledgeable and experienced members of the trucking industry. Balister and Roadway are not unsophisticated and vulnerable members of the general public, and this matter concerns the contracting parties' private interests in avoiding losses inflicted *upon* their operations, not *by* them. Accordingly, as the public interest is not involved, Balister and Roadway could not rely on 49 C.F.R. 376.12(c)(1) to sustain a claim that C*Mac violated the TIL regulations by refusing to pay the tractor-related towing and storage charges.

{¶30} Importantly, this understanding of the scope of 49 C.F.R. 376.12(c)(1) is consistent with the remainder of the TIL regulations. The TIL regulations do not require any particular allocation of responsibility for towing and storage costs between the lessor and the lessee. In fact, towing and storage charges are not mentioned anywhere in the TIL regulations. However, the TIL regulations do specifically mention certain charges relating to the normal operation of the lessor's vehicle and how those charges may be allocated between the lessor and the lessee:

> (e) Items specified in lease. * * * *The lease shall clearly specify the responsibility of each party with respect to the cost of fuel, fuel taxes, empty mileage, permits of all types, tolls, ferries, detention and accessorial services, base plates and licenses, and any unused*

> *portions of such items.* The lease shall clearly specify who is responsible for loading and unloading the property onto and from the motor vehicle, and the compensation, if any, to be paid for this service.

(Emphasis added.) 49 C.F.R. 376.12(e). Thus, while 49 C.F.R. 376.12(e) does not mandate any particular allocation, it does allow that the lessor may be required to pay for the listed operational expenses. Furthermore, the TIL regulations permit the motor carrier lessee to require the owner-operator lessor to deposit "escrow funds" with the lessee or a third party, subject to certain requirements. 49 C.F.R. 376.12(k). "Escrow fund" is defined as "[m]oney deposited by the lessor with either a third party or the lessee to guarantee performance, to repay advances, *to cover repair expenses*, to handle claims, *to handle license and State permit costs, and for any other purposes mutually agreed upon by the lessor and lessee.*" (Emphasis added.) 49 C.F.R. 376.2(l). Therefore, the TIL regulations explicitly provide that a motor carrier lessee may require the owner-operator lessor to pay for a significant portion of the costs of operating and maintaining the leased vehicle. Balister and Roadway's interpretation of 49 C.F.R. 376.12(c)(1)—an interpretation that would require the motor carrier lessee to pay for towing and storage costs and seemingly deprive the lessee of the ability to negotiate with the owner-operator lessor regarding payment of these costs—would not be consistent with these other parts of the TIL regulatory scheme that allow for allocation of similar costs to the lessor.

**{¶31}** Although we conclude that Balister and Roadway's first TIL claim failed as a matter of law because the TIL regulations themselves do not require motor carrier lessees such as C*Mac to pay for towing and storage charges like those incurred in this case, Balister and Roadway also claimed that C*Mac violated the TIL regulations by failing to include each and every TIL-required provision in the Agreement. Indeed, in their opening statement, Balister and Roadway asserted that the Agreement did not include the "complete responsibility" provision required by 49 C.F.R. 376.12(c)(1). Nevertheless, Balister and Roadway could not sustain a TIL claim simply by demonstrating that the "complete responsibility" provision required by 49 C.F.R. 376.12(c)(1) was not incorporated into the Agreement. Under 49 U.S.C. 14704(a)(2), the owner-operator lessor must produce evidence showing that he sustained actual damages as a result of the motor carrier lessee's failure to comply with 49 C.F.R. 376.12. *Owner-Operator Indep. Drivers Assn., Inc. v. Landstar System, Inc.*, 622 F.3d 1307, 1325-1326 (11th Cir.2010). Thus, an argument that the lessor was damaged by the mere omission of a TIL-required contractual provision, and nothing more, is insufficient as such an argument "is akin to statutory or presumed damages, rather than sustained damages as required by § 14704(a)(2)." *Id.* at 1325.

**{¶32}** Here, it is abundantly clear from Balister and Roadway's opening statement that they would not have been able to prove that they sustained actual

damages as a result of C*Mac's failure to include the "complete responsibility" provision in the Agreement. Even if C*Mac had included the "complete responsibility" provision in the Agreement as required by 49 C.F.R. 376.12(c)(1), for the reasons outlined above, that provision would not have obligated C*Mac to pay for the tractor-related towing and storing charges incurred in this case.[6] Consequently, Balister and Roadway could not prove that they suffered a loss because their claimed loss would not have been avoided even if C*Mac had fully complied with the TIL regulations. Accordingly, Balister and Roadway's second TIL claim also failed as a matter of law.

{¶33} In sum, even liberally construing Balister and Roadway's opening statement in their favor, it is clear from their opening statement alone that they would have been totally incapable of sustaining their TIL claims at trial. Therefore, we conclude that the trial court did not err by granting C*Mac's motion for directed verdict on Balister and Roadway's TIL claims.

## ii. Breach of Contract

{¶34} Turning to Balister and Roadway's breach-of-contract claim, we again begin by examining Balister and Roadway's opening statement. In his opening statement, Balister and Roadway's counsel mentioned "the operating agreement that C*Mac Transportation, LLC had with Roadway Logistic Systems Co." and the

---

[6] After reviewing the record, it appears that the "complete responsibility" provision was in fact omitted from the Agreement.

"federal code called the Truth-in-Leasing Act" that was "[i]n that operating agreement." (Balister & Roadway's Opening Statement, Feb. 15-16, 2022 Tr. at 74). Balister and Roadway's counsel then referred specifically to C*Mac having "possession, use, and control of the equipment during the course of the lease." (Balister & Roadway's Opening Statement, Feb. 15-16, 2022 Tr. at 74). He later stated that he was planning to "go through the contract between C*Mac Transportation and Roadway Logistic and talk about the rights and obligations they're under [sic]," but he did not discuss any additional provisions of the Agreement. (Balister & Roadway's Opening Statement, Feb. 15-16, 2022 Tr. at 76). Instead, he simply concluded that there were "claims for breach of contract against C*Mac." (Balister & Roadway's Opening Statement, Feb. 15-16, 2022 Tr. at 77).

{¶35} As expressed in Balister and Roadway's opening statement, their claim was that C*Mac breached the Agreement by refusing to pay for the tractor-related towing and storage charges because, under the Agreement, C*Mac had an obligation to pay these charges since it was the party with "possession, use, and control" of the 2003 Volvo. However, to the extent that this provision was likely included in the Agreement to bring C*Mac into compliance with the requirements of 49 C.F.R. 376.12(c)(1), the only contractual obligation created thereby would be the one contemplated by 49 C.F.R. 376.12(c)(1). As we have previously explained,

that obligation does not encompass responsibility for paying for things like the tractor-related towing and storage charges incurred in this case. Thus, because the only provision of the Agreement explicitly mentioned in Balister and Roadway's opening statement is a provision that C*Mac almost certainly did not breach when it refused to pay for the tractor-related towing and storage charges, it appears from Balister and Roadway's opening statement that they would likely have been completely incapable of sustaining their breach-of-contract claim. Yet, Balister and Roadway's counsel did not discuss every provision of the Agreement, nor did his opening statement foreclose the possibility that C*Mac was obligated by some other part of the Agreement to pay for the tractor-related towing and storage charges. Accordingly, in liberally construing Balister and Roadway's opening statement in their favor, it is appropriate to look to the pleadings, which contain a copy of the Agreement. (*See* Complaint, Ex. 1).

{¶36} Upon reviewing the Agreement, it is evident that Balister and Roadway did not have a viable cause of action for breach of contract. First, the Agreement clarifies that the "possession, use, and control" provisions referenced in Balister and Roadway's opening statement were intended to obligate C*Mac only to the extent required by 49 C.F.R. 376.12(c)(1). Indeed, these provisions provide that C*Mac shall have "possession, use, and control" of the 2003 Volvo "*to the extent required by*" 49 C.F.R. 376.12(c)(1) and the "exclusive possession, use and

control of the [2003 Volvo] *required by*" 49 C.F.R. 376.12(c)(1). (Emphasis added.) (Complaint, Ex. 1). Thus, C*Mac's obligations under these contractual provisions are coextensive with its obligations under 49 C.F.R. 376.12(c)(1), which does not require C*Mac to pay for things like the tractor-related towing and storage charges incurred in this case.

**{¶37}** In addition, the Agreement contains provisions indicating that Roadway, not C*Mac, is responsible for paying for the tractor-related towing and storage charges. To begin, Section 2C of the Agreement (relevant portions reproduced above) provides that Roadway is to bear "all costs and expenses incidental to operation" of the 2003 Volvo "*including, without limitation*, * * * all maintenance * * * [and] repairs" as well as a host of other enumerated operational costs and expenses. (Emphasis added.) (Complaint, Ex. 1). The tractor-related towing and storage charges can arguably be placed in the same category as the costs and expenses listed in Section 2C of the Agreement and thus might be considered Roadway's responsibility despite not being expressly listed therein.

**{¶38}** Even more significantly, Section 4C of the Agreement provides that C*Mac is not liable to Roadway for any "negligence, depreciation, loss or damage that may occur" to the 2003 Volvo due to "collision, fire, theft, or similar occurrence." (Complaint, Ex. 1). By referring both to "loss" and to "damage,"

C*Mac's nonliability cannot be limited solely to physical damage to the 2003 Volvo. "Loss" must therefore be broader in scope.

**{¶39}** "Loss" is not defined in the Agreement, but in the analogous context of insurance contracts, "loss" has been previously found to include the costs of towing and storage incurred after a vehicle collision. *Westfall v. Dlesk*, 7th Dist. Harrison No. 14 HA 17, 2015-Ohio-4313, ¶ 25-27 (where insurance contract defined "loss" as "'direct and accidental loss or damage,'" towing and storage charges incurred after insured's collision with a tree were a "'loss' to a covered 'auto'" fitting under the insured's collision coverage). Moreover, towing and storage fees have been found to be properly recoverable in a negligence action as costs proximately caused by the tortfeasor's negligence. *Bingham v. Slabach*, 5th Dist. Stark Nos. 2008-CA-0085 and 2008-CA-0086, 2008-Ohio-5555, ¶ 20 (concluding that the plaintiff was "entitled to recover all the costs proximately caused by [the defendant's] negligence" and that "the record demonstrate[d] that [the plaintiff] paid for towing, storage, and a rental car, all necessitated by [the defendant's] negligence"); *see State Farm Mut. Auto Ins. Co. v. Toro*, 127 N.J.Super. 223, 228 (N.J.Super.Ct. Law Div.1974) ("[T]he court considers the towing and storage charges to have been naturally and proximately caused by the accident * * *. They are damages which the insured is 'legally entitled to recover.'

It is highly foreseeable that the owner of a damaged vehicle will have to tow it from the scene of an accident and store it at some location to await repair.").

**{¶40}** There is substantial authority supporting that "loss" includes the towing and storage costs incurred after a vehicular accident. Section 4C of the Agreement broadly absolves C*Mac of all liability for any "loss" to the 2003 Volvo caused by negligence. As the Agreement also contemplates C*Mac's nonliability for "loss" caused by third-party actions such as theft, this clearly extends to "loss" caused by a third-party tortfeasor's negligence. Consequently, the towing and storage costs incurred in this case are a "loss" to the 2003 Volvo caused by a third-party's negligence, for which C*Mac is not liable under Section 4C of the Agreement.

**{¶41}** Therefore, after reviewing Balister and Roadway's opening statement, and using the pleadings to construe their statement liberally in their favor, it is clear that Balister and Roadway would have been completely unable to sustain their breach-of-contract claim at trial. Under the plain terms of the Agreement, it is simply not C*Mac's responsibility to pay for the towing and storage of the 2003 Volvo. Accordingly, we conclude that the trial court did not err by granting C*Mac's motion for directed verdict on Balister and Roadway's breach-of-contract claim.

### iii. Bill Splitting

{¶42} Balister and Roadway's final argument regarding the trial court's decision granting C*Mac's motion for directed verdict is that the trial court did not address their claim that C*Mac acted inappropriately with respect to the split of Big Daddy's Towing's bill. Balister and Roadway contended that the bill was split disproportionately between themselves and C*Mac in that some of the charges Big Daddy's Towing billed to Balister and Roadway were actually charges related to the more-expensive recovery and towing of C*Mac's trailer. Balister and Roadway claimed that C*Mac was at fault because it directed Big Daddy's Towing to split the bill in this way.

{¶43} While it is true that the trial court did not address the bill-split issue when it granted C*Mac's motion for directed verdict, the bill-split issue goes not to C*Mac's liability but rather to the reasonable value of the services provided by Big Daddy's Towing. Balister and Roadway's opening statement did not foreclose the possibility that they could produce evidence establishing that their half of Big Daddy's Towing bill exceeded the reasonable value of the services provided for the recovery and towing of the 2003 Volvo and that some of the charges on their bill were actually incurred in the recovery and towing of C*Mac's trailer. If Balister and Roadway could establish that the bill was unfairly split, then Balister and Roadway would only be required to pay for the reasonable value of the services Big

Daddy's Towing provided for the 2003 Volvo. If, as a consequence, there were any shortfall in the bill because some of the services were provided for C*Mac's trailer, then Big Daddy's Towing would have to look to C*Mac to make up the difference. But these disputes would be between Balister, Roadway, and Big Daddy's Towing or C*Mac and Big Daddy's Towing. Neither would involve a dispute between Balister, Roadway, and C*Mac. The trial court therefore acted properly by not addressing the bill-split issue when deciding C*Mac's motion for directed verdict.

## C. Big Daddy's Towing's Civ.R. 50(A)(1) Motion & the Trial Court's Decision

{¶44} Although it is rare for a plaintiff or, as in this case, a counterclaimant to move for directed verdict on their own claim at the close of the defending party's opening statement, and rarer still for such a motion to be granted, doing so is permissible under Civ.R. 50(A)(1). *See Brinkmoeller*, 41 Ohio St.2d 223 at syllabus (holding that a directed verdict after opening statement may be granted if it is "clear that all the facts expected to be proved, and those that have been stated, do not constitute a cause of action *or a defense*") (Emphasis added.); 88 Corpus Juris Secundum, Trial, Section 268 (Rev. Sept.2022) ("[T]he court may properly enter * * * directed verdict for the plaintiff on the defendant's opening statement, where it is plain that the facts sought to be proved as stated * * * would not constitute a defense, as where the defendant * * * makes an affirmative admission of facts, removing the facts from controversy and resulting in no defense to the action.");

75A American Jurisprudence 2d, Trial, Section 806 (Rev. Aug.2022) ("It is proper to direct a verdict for the plaintiff on the defendant's opening statement where the defendant admits facts showing that the defendant is liable, or that the defense is invalid.").

{¶45} In this case, after Balister and Roadway's opening statement, Big Daddy's Towing moved for directed verdict on its counterclaim

> based upon the admissions made by Plaintiffs' counsel in their opening statements; specifically * * * that he admitted that the Plaintiffs own the truck at issue, the Plaintiffs were driving the truck at issue, and that they're not disputing we towed it and provided services. Those are clearly sufficient admissions to establish liability on our counterclaim.

(Big Daddy's Towing's Motion for Directed Verdict, Feb. 15-16, 2022 Tr. at 85). Big Daddy's Towing's counsel later clarified that the counterclaim was based on a quasi-contractual theory.

{¶46} In granting Big Daddy's Towing's motion for directed verdict as to Balister and Roadway's liability for the tractor-related towing charges and some of the tractor-related storage charges, the trial court concluded:

> It is clear and uncontested * * * that Big Daddy's provided services for the benefit of Plaintiffs in towing their vehicle and storing the same since; and it is undisputed that the towing bill and storage through April 14 is owed to Big Daddy's by Plaintiffs, as they received the benefit of those services for their vehicle which they owned, and which they continue to own * * *.
>
> The Court finds that Big Daddy's provided towing and some storage services for the Plaintiffs, that Plaintiffs were aware of the services

being provided by Big Daddy's and accepted the benefit of that recovery and towing of their semi-tractor on March 17, 2017, and at least some storage thereafter; that Plaintiffs had the opportunity to prevent Big Daddy's from providing those services but that Thomas Balister on his own behalf and on behalf of his company allowed Big Daddy's to be summoned to do the work, and did not stop the work when returning to the crash scene as it was being cleared and prior to their semi-tractor being towed from the scene, and that Big Daddy's is entitled to the reasonable value of the services provided.

(Doc. Nos. 79, 88). Accordingly, the trial court directed a verdict both as to Balister's personal liability and Roadway's liability to Big Daddy's Towing for the tractor-related towing and storage charges incurred from March 17, 2017, through April 14, 2017. However, the value of the services Big Daddy's Towing rendered for Balister and Roadway from March 17, 2017, through April 14, 2017, was to be determined by the jury. In addition, Balister and Roadway's potential liability for the storage charges after April 14, 2017, as well as the value of those charges, was to be determined by the jury, through the verdict forms, as well as the trial court's statements on the record and in its judgment entry, indicated that if the jury ruled in favor of Big Daddy's Towing on the issue of liability for these charges, it would have to find Roadway liable and Balister liable in his personal capacity.

**i. Bill Splitting**

**{¶47}** Balister and Roadway again fault the trial court for failing to address the bill-split issue, this time arguing that the trial court ought to have dealt with the issue when it decided Big Daddy's Towing's motion for directed verdict. As we

-34-

have explained, the bill-split issue concerned the reasonable value of the services Big Daddy's Towing provided in recovering and towing the 2003 Volvo. The trial court expressly declined to direct a verdict with respect to the reasonable value of the services Big Daddy's Towing provided for Balister and Roadway, instead sending the issue to the jury for determination. Balister and Roadway argue that "Big Daddy's Towing had contributed to its own damages by improperly splitting the bill" and that "a reasonable finder of fact could have concluded that Big Daddy's Towing was not entitled to the entire sum of the tow bill." As the jury was given an opportunity to consider Balister and Roadway's arguments and reach the very conclusions urged by them, their argument is without merit.

## ii. Balister's Personal Liability

{¶48} Before determining whether Balister and Roadway's opening statement conclusively established any liability to Big Daddy's Towing, we must address Balister's argument that the trial court erred by finding that he was personally liable to Big Daddy's Towing. Although not incorporated into the trial court's judgment entry granting Big Daddy's Towing's motion for directed verdict, the trial court made the following findings on the record regarding Balister's personal liability:

> The Court notes that the vehicle is really owned by Mr. Balister and not by the company. They have together brought various claims against and named Big Daddy's as a Defendant. So to the extent that the vehicle is owned by one of the Plaintiffs, it's clear that that vehicle

was used in the company owned by Mr. Balister and others apparently, so that it's clear that the Plaintiff Thomas Balister and indirectly Roadway Logistic Systems Company, which apparently operated the vehicle, benefitted from the services from Big Daddy's Towing.

(Feb. 15-16, 2022 Tr. at 113). Throughout its judgment entry, the trial court found that Big Daddy's Towing had provided services for Balister's personal benefit, as well as for Roadway's benefit, with respect to tractor-related towing and storage charges. (Doc. Nos. 79, 88).

{¶49} While unstated, this finding does not appear to be limited to Balister's personal liability for the tractor-related towing and storage charges incurred from March 17, 2017, through April 14, 2017. Although the issue of liability for post-April 14, 2017 storage charges was submitted to the jury, the jury was not given the option of finding Roadway liable for the charges while also finding Balister not personally liable. Indeed, Interrogatory #2 asked the jury to determine "the reasonable value of the storage services provided by Big Daddy's Towing for Plaintiffs' semi-tractor from March 17, 2017 through the present" and the verdict form read: "We, the jury duly impaneled and sworn, do hereby find in favor of the Defendant, Big Daddy's Towing, Inc., and against the Plaintiffs, Thomas Balister and Roadway Logistics [sic] Systems Co." (Doc. Nos. 84, 86). Thus, it was an all-or-nothing proposition. The jury could rule against Big Daddy's Towing on the issue of liability for the post- April 14, 2017 storage charges, but if it ruled in its

-36-

favor, Balister would necessarily be found personally liable along with Roadway. Therefore, in granting a directed verdict collectively against the plaintiffs, the trial court determined Balister would be personally liable.

{¶50} However, after reviewing Balister and Roadway's opening statement, we fail to see any statement or admission that, when properly liberally construed in Balister's favor, supports the trial court's findings regarding Balister's personal liability to Big Daddy's Towing. During opening statement, Balister's counsel stated that "C*Mac sold the truck in question to Roadway Logistic Systems in * * * 2016, and that's what the ownership status was at the time, and to this day, Roadway Logistic * * * still owns that truck." (Balister & Roadway's Opening Statement, Feb. 15-16, 2022 Tr. at 74). Thus, Balister's counsel clearly stated that Roadway, rather than Balister, owned the 2003 Volvo.

{¶51} Admittedly, Balister's counsel made several remarks throughout opening statement suggesting that Balister had an ownership interest in the 2003 Volvo. For example, Balister's counsel stated that, in 2017, Balister "had three other trucks that * * * he was leasing * * * and then re-leasing * * * to C*Mac" but that "[t]he difference with the Volvo [was] he actually owned the Volvo." (Balister & Roadway's Opening Statement, Feb. 15-16, 2022 Tr. at 71). Balister's counsel also referred to the 2003 Volvo as "his" (Balister's) truck several times and said that

after the accident, Balister "didn't have the tractor that he owned." (Balister & Roadway's Opening Statement, Feb. 15-16, 2022 Tr. at 67, 71).

{¶52} But in liberally construing the opening statement in Balister's favor, these statements do not definitively establish Balister's ownership of the 2003 Volvo and, therefore, his personal liability to Big Daddy's Towing. Balister's counsel's references to the 2003 Volvo being "his" tractor and to the vehicle being "owned" by Balister simply reflected the fact that Balister was closely aligned with Roadway as one of its shareholders and that Balister was in direct physical control of the vehicle on March 17, 2017. Nor do these references neutralize counsel's plain statement that Roadway purchased and owned the 2003 Volvo. Therefore, liberally construing the opening statement in Balister's favor, it is far from definite that Balister "really owned" the 2003 Volvo or that Balister derived a personal benefit from Big Daddy's Towing's services. The opening statement does not show that Balister would have been utterly incapable of sustaining an argument that he was not personally liable to Big Daddy's Towing for the tractor-related towing and storage charges. *See Hollis Towing v. Greene*, 155 Ohio App.3d 300, 2003-Ohio-5962, ¶ 8-9 (2d Dist.) (affirming grant of judgment on the pleadings where despite lienholder's offer to pay towing and storage charges for totaled vehicle, lienholder was not liable in quasi-contract to towing company because towing and storage did

not benefit lienholder—a non-owner who "had no interest in reclaiming the vehicle and no legal obligation to do so").

{¶53} Moreover, the pleadings do not conclusively establish that Balister had an ownership interest in the 2003 Volvo. Again, in Balister and Roadway's complaint, the 2003 Volvo is loosely referred to as "Plaintiffs' semi-tractor" or "Plaintiffs' semi-truck," implying that Balister and Roadway both had an ownership interest in the vehicle. However, Balister and Roadway also clearly averred that "Roadway Logistic Systems Co. purchased [the] 2003 Volvo semi-tractor truck * * * from C*Mac Transportation, LLC." (Complaint at ¶ 15).

{¶54} In light of the foregoing, and considering the liberal construction to be afforded to the opening statement and the great caution that must be exercised in granting a motion for directed verdict after opening statement, we conclude that the trial court erred by directing a verdict on the issue of Balister's personal liability to Big Daddy's Towing for the tractor-related towing and storage charges.

### iii. Roadway's Liability in Quasi-Contract

{¶55} Although we conclude that the trial court erred by entering a directed verdict on the issue of Balister's personal liability to Big Daddy's Towing, this does not mean that the trial court erred by directing a verdict as to Roadway's liability. In determining whether the trial court erred by directing a verdict on Roadway's liability to Big Daddy's Towing, our starting point is, once again, Balister and

Roadway's opening statement. During his opening statement, Balister and Roadway's counsel made several statements relevant to whether Roadway was liable to Big Daddy's Towing in quasi-contract. Their counsel first remarked:

> Mr. Balister was driving a 2003 Volvo semi when a driver crossed the median and smashed into his semi. Mr. Balister called immediately the safety director for C*Mac and she told him that everything's going to be fine, and she made initial call to Big Daddy's Towing to have the semi-tractor and trailer towed. That call occurred prior to the state troopers and responders arriving at the crash. The safety director called Mr. Balister back after five minutes and told them at that point that they had contacted Big Daddy's and arranged for the tow.

(Balister & Roadway's Opening Statement, Feb. 15-16, 2022 Tr. at 67-68). Counsel then stated that Balister was taken "to Sidney Hospital in an ambulance, and his ex-wife and the secretary of the company * * * came down to Sidney and picked him up and Mr. Balister drove back up north and passed the scene again on his way back home." (Balister & Roadway's Opening Statement, Feb. 15-16, 2022 Tr. at 68). According to Balister and Roadway's counsel, "Mr. Balister then did not do anything with the truck for several weeks" before attempting to retrieve the vehicle in April 2017. (Balister & Roadway's Opening Statement, Feb. 15-16, 2022 Tr. at 68-69). Finally, counsel conceded that Balister and Roadway were "not disputing that [Big Daddy's Towing] provided towing services for the truck" and that Big Daddy's Towing "did provide those services, and * * * that they're entitled to be paid for it, but that C*Mac Transportation is the one that should be required to pay for it." (Balister & Roadway's Opening Statement, Feb. 15-16, 2022 Tr. at 75-76).

-40-

{¶56} As the name suggests, quasi-contracts are not true contracts. *Hummel v. Hummel*, 133 Ohio St. 520, 525 (1938). Instead, "[l]iability in quasi-contract originates out of an obligation arising by law upon a person in receipt of benefits that he or she is not justly entitled to retain." *Estate of Neal v. White*, 1st Dist. Hamilton No. C-180579, 2019-Ohio-4280, ¶ 9, citing *Hummel* at 526. "The three criteria for recovery under the theory of quasi-contract are: '"(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment * * *."'" *L&H Leasing Co. v. Dutton*, 82 Ohio App.3d 528, 534 (3d Dist.1992), quoting *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183 (1984). "The purpose of the quasi-contract action is not to compensate the plaintiff for any loss or damage suffered by him but to compensate him for the benefit he has conferred on the defendant." *Hughes v. Oberholtzer*, 162 Ohio St. 330, 335 (1954).

{¶57} In this case, Balister and Roadway's counsel's concessions and affirmative admissions during opening statement established Roadway's liability to Big Daddy's Towing in quasi-contract. First, it was clear from the opening statement that Big Daddy's Towing conferred a benefit by towing and storing the 2003 Volvo. Towing the 2003 Volvo ensured that the vehicle would not pose a continuing hazard to the traveling public by remaining on the highway and that the

vehicle would not sustain further damage. Similarly, in storing the 2003 Volvo on Big Daddy's Towing's lot, the vehicle was protected from vandalism or further damage and preserved pending the conclusion of the investigation into the accident and resolution of potential insurance claims or lawsuits.

{¶58} Furthermore, it was evident from the opening statement that Big Daddy's Towing's services inured to Roadway's benefit. Even liberally construing the opening statement in Roadway's favor, it was apparent that Roadway had some proprietary interest in the 2003 Volvo. As mentioned above, Balister and Roadway's counsel indicated that Roadway purchased and still owns the 2003 Volvo, and to the extent the pleadings can be considered, Roadway was repeatedly identified in the complaint as owning the vehicle. Although remarks in the opening statement and averments in the complaint suggested Balister might have some ownership interest, we cannot ignore counsel's attempt to clarify that Roadway, not Balister, owned the 2003 Volvo. Specifically, while technically not part of the opening statement, in proffering the proposed amendments to his opening statement, Balister and Roadway's counsel stated that "the certificate of title for the semi tractor-trailer 2003 Volvo is owned by Roadway Logistic Systems Co., not by Thomas Balister individually." (Feb. 15-16, 2022 Tr. at 107). Thus, it was Balister and Roadway's position that Roadway owned the 2003 Volvo, and they would have sought to demonstrate at trial that Roadway owned the vehicle. Hence, what was

uncertain from the opening statement was the extent of Balister's interest in the 2003 Volvo, not Roadway's. It was, and remains, Roadway's ardent position that it owned the 2003 Volvo, and consequently, Roadway was clearly a beneficiary of Big Daddy's Towing's services.

{¶59} In addition, it was apparent from the opening statement that through Balister, Roadway had knowledge of the benefits Big Daddy's Towing conferred on it. Clearly, Balister was empowered to act on behalf of Roadway. Throughout opening statement, counsel intimated that Roadway was Balister's company. (*See* Balister & Roadway's Opening Statement, Feb. 15-16, 2022 Tr. at 69-71, 76-77). Furthermore, Balister obviously had some authority to represent Roadway because it was Balister, on behalf of Roadway, who contacted Big Daddy's Towing in April 2017 and asked that the 2003 Volvo be released. (*See* Balister & Roadway's Opening Statement, Feb. 15-16, 2022 Tr. at 69-70, 75, 77). Reference to the pleadings only reinforces Balister's status as Roadway's agent because, reviewing the copy of the Agreement attached to the complaint, it was Balister who signed the Agreement on behalf of Roadway. (Complaint, Ex. 1).

{¶60} Although Balister did not contact Big Daddy's Towing to engage their services, Balister was aware that Big Daddy's Towing would be providing services for the 2003 Volvo. When C*Mac's representative called Balister back, Balister was informed that Big Daddy's Towing would be responding to the scene of the

accident. (Balister & Roadway's Opening Statement, Feb. 15-16, 2022 Tr. at 68). At that point, Balister knew that Big Daddy's Towing would be imminently providing towing services for the 2003 Volvo. Balister could then have attempted to discharge Big Daddy's Towing and retain his preferred towing service to recover the 2003 Volvo, but he did not do so. Moreover, Balister later drove by the scene of the accident after he was released from the hospital. (Balister & Roadway's Opening Statement, Feb. 15-16, 2022 Tr. at 68). Balister could then have directed Big Daddy's Towing to cease its recovery of the 2003 Volvo or tow the vehicle to a destination of Balister's choosing. Balister did neither of these things. Finally, despite being aware that Big Daddy's Towing had towed the 2003 Volvo from the scene of the accident on March 17, 2017, and that the vehicle was in Big Daddy's Towing's possession, Balister took no action with respect to the 2003 Volvo until he unsuccessfully requested its release in April 2017. (Balister & Roadway's Opening Statement, Feb. 15-16, 2022 Tr. at 68-70). Balister thus was aware that Big Daddy's Towing had been storing the 2003 Volvo from March 17, 2017, onward. Therefore, from the opening statement, it was plain that Balister was aware of all the benefits conferred by Big Daddy's Towing, and as Balister had the authority to represent Roadway, his knowledge of these benefits can be imputed to Roadway.

**{¶61}** Finally, Balister and Roadway's opening statement supported that it would be inequitable for Roadway to retain the benefit of Big Daddy's Towing's services without providing reasonable compensation. In the opening statement, counsel conceded that Big Daddy's Towing provided services and that they were entitled to payment for those services. (Balister & Roadway's Opening Statement, Feb. 15-16, 2022 Tr. at 75-76). While it was Balister and Roadway's position that C*Mac should be responsible for compensating Big Daddy's Towing, they nonetheless conceded that justice required that someone pay Big Daddy's Towing for the tractor-related towing and storage charges. Roadway is bound by that statement, and given that C*Mac is not obligated to pay for Roadway's towing and storage charges and that the opening statement establishes Roadway's proprietary interest in the 2003 Volvo, that someone is, at minimum, Roadway.

**{¶62}** Therefore, after reviewing Balister and Roadway's opening statement, and construing the statement liberally in Roadway's favor, it is clear that Roadway would have been entirely incapable of defending against Big Daddy's Towing's counterclaim on the basis that it was not liable for the tractor-related towing and storage charges. Accordingly, we conclude that to the extent that the trial court directed a verdict as to Roadway's liability for the tractor-related towing and storage costs, the trial court did not err.

**D. Balister & Roadway's Request to Supplement Opening Statement**

{¶63} In their third assignment of error, Balister and Roadway argue that the trial court erred by refusing to allow them to amend their opening statement. Where a motion for directed verdict is made after opening statement, "'full opportunity should be given the party making the statement to supplement the statement before a verdict is directed against him.'" *Triplett v. Motter*, 3d Dist. Auglaize No. 2-85-19, 1986 WL 10765, *3 (Sept. 29, 1986), quoting *Hayes v. Barnes*, 32 Ohio Law Abs. 274, 275 (9th Dist.1939). "'"[T]he trial court should not act arbitrarily nor take an undue advantage of the [nonmoving party] or his attorney, but full opportunity should be given to the [nonmoving party] to amend his petition or his opening statement, or both, so that he could supply the missing facts, if possible to do so."'" *Id.*, quoting *Hayes* at 275, quoting *Douglas v. Olson Constr. Co.*, 5 Ohio Law Abs. 86, 86 (9th Dist.1926). It should be apparent from the record that the nonmoving party was afforded such an opportunity. *Barton v. Krohn*, 103 Ohio App. 373, 374-375 (3d Dist.1955).

{¶64} Here, the trial court did not allow Balister and Roadway to reopen their opening statement. Their counsel was not permitted to again stand before the jury and amplify or amend the opening statement. Nevertheless, the trial court did ask Balister and Roadway's counsel to proffer for the court and for the record counsel's proposed amendments to his opening statement. Having reviewed the proffer, none

-46-

of counsel's desired additions or clarifications would have improved Balister's or Roadway's positions or demonstrated that they could sustain their claims or defenses, with one exception. That exception concerns counsel's clarification regarding how the 2003 Volvo was titled, which would have served as an additional data point suggesting that Balister did not own the vehicle and that he therefore might not be personally liable to Big Daddy's Towing. However, as we have already concluded, the opening statement as initially delivered by Balister and Roadway's counsel did not support the trial court's decision to direct a verdict in Big Daddy's Towing's favor on the issue of Balister's personal liability. Therefore, even if we were to conclude that the trial court erred by prohibiting Balister and Roadway's counsel from supplementing his opening statement in front of the jury, such error would not be prejudicial.

## E. Summary

{¶65} In sum, the trial court did not err by directing a verdict in C*Mac's favor with respect to Balister and Roadway's TIL and breach-of-contract claims. Furthermore, the trial court did not err by failing to address the bill-split issue in its decision on the motions for directed verdict, nor did it err by directing a verdict on the issue of Roadway's liability to Big Daddy's Towing for the tractor-related towing and storage charges. However, the trial court did err by directing a verdict as to Balister's personal liability to Big Daddy's Towing. Finally, the trial court did

-47-

not commit prejudicial error by refusing Balister and Roadway's request to reopen and supplement their opening statement. Therefore, Balister and Roadway's first and third assignments of error are overruled. However, the second assignment of error is sustained in part and overruled in part.

### IV. Conclusion

{¶66} For the foregoing reasons, Balister and Roadway's first and third assignments of error are overruled. However, the second assignment of error is sustained with respect to the issue of Balister's personal liability to Big Daddy's Towing, but otherwise overruled. Having found error prejudicial to Balister regarding the issue of his personal liability to Big Daddy's Towing, we reverse the judgment of the Auglaize County Court of Common Pleas as to that issue and remand for further proceedings consistent with this opinion. In all other respects, we affirm.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**ZIMMERMAN, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**